STATE of Wisconsin, Plaintiff-Respondent,

v.

Jeffrey Lorenzo SEARCY, Defendant-Appellant.†

Court of Appeals

*No. 2004AP2827–CR. Submitted on briefs October 14, 2005.
—Decided December 21, 2005.*

2006 WI App 8

(Also reported in 709 N.W.2d 497.)

† Petition to review filed.

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Joseph L. Sommers*, Madison.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *Aaron R. O'Neil*, assistant attorney general, and *Peggy A. Lautenschlager*, attorney general.

Before Snyder, P.J., Nettesheim and Anderson, JJ.

¶ 1. ANDERSON, J.   Jeffrey Lorenzo Searcy appeals from a judgment convicting him of two counts of burglary, one as party to a crime, and an order denying

his postconviction motion. He challenges his conviction on several disparate grounds. First, he argues that there was insufficient evidence to convict him of either of the two counts of burglary. Second, he claims that the jury received prejudicial extraneous information relating to his prior convictions. Third, he mounts a constitutional challenge to the admission of statements his cousin, Leisa Adams, made to police officers at the scene of his arrest. Searcy complains that the admission of the statements, which tied him to the residence where the police found stolen items, through the testimony of an officer violated his confrontation rights under the analysis of "testimonial" statements announced in *Crawford v. Washington*, 541 U.S. 36 (2004). Finally, he raises two additional constitutional challenges.

¶ 2.  We hold that there was sufficient evidence to support Searcy's convictions on both counts of burglary. We uphold the trial court's finding that Searcy failed to satisfy his burden of proving by clear, satisfactory and convincing evidence that the jury had been exposed to improper extraneous information regarding his prior convictions. The trial court simply made a credibility determination with which we cannot quarrel. We hold that the admission of the officer's testimony concerning Adams' statements about the location of Searcy's residence did not violate Searcy's confrontation rights. Adams initiated the contact with the police officers and spontaneously made the unsolicited statements; therefore, her statements were not "testimonial" within the meaning of *Crawford*. We also reject as harmless Searcy's other two claims of constitutional error. We affirm.

## I. FACTS

¶ 3.  On July 8, 2001, the State filed a criminal complaint against Searcy charging him with burglariz-

813

ing the home of Darrin and Michelle Hoffman. Later in July, the State filed an amended complaint charging Searcy with burglarizing the home of Brad and Lauri DuRocher.

¶ 4. A multiple-day jury trial on the two charges was held in December 2002. The State called to testify: several of the officers involved in the investigation of the burglaries, an employee of the Department of Justice Crime Laboratory, Darrin and Michelle Hoffman, and Lauri DuRocher. Searcy presented the testimony of his friend, Kimberly Jackson. Because Searcy challenges the sufficiency of the evidence to convict him, we recount the pertinent portions of each witness' testimony below.

¶ 5. The State first called Darrin Hoffman. Darrin testified that when he returned home on May 19, 2001, he found the front screen door and interior door open and some of the framework broken. He testified that he called the police before entering the home because he had left a loaded .357 magnum in his home and was worried the intruder was still in the house. After the police arrived, Darrin discovered that the gun, a VCR, jewelry and a pillowcase were taken from his home. He stated that he had not given anyone permission to take the items from his home. He also testified that the bedroom window was left wide open and the window screen was mangled and lying on the bed. He stated that the only way to remove the screen from the window was from inside the house.

¶ 6. The State then called several of the officers involved in the investigation of the Hoffman burglary. Charles Ashbeck, a Racine Police Department Patrol Sergeant, testified that he responded to the Hoffman burglary complaint. When he arrived at the Hoffman residence, he observed: "The front door appeared to be

kicked in, so it looked to me as that was the point of entry." Ashbeck testified that he came to the conclusion that the door had been kicked in because "the door jamb, where the door connects, that was broke and the wood was all split off, and there was a footprint on the door." He also observed that the window screen from the back bedroom was "all bent" and lying on the bed.

¶ 7. Next, Donald Prudhom, a patrolman and evidence technician with the City of Racine Police Department, testified. He stated that he lifted a palm print and fingerprint from the bedroom window screen. James Yoghourtjian, a forensic criminalist for the City of Racine Police Department, testified that he analyzed the fingerprint impression and it positively matched Searcy's left thumb. Jeffrey May, an employee of the identification unit of the Department of Justice Crime Laboratory, testified that he matched the palm print Prudhom lifted with Searcy's print to a reasonable degree of professional certainty.

¶ 8. Amanda Guth, a deputy with the Racine County Sheriff's Department whose duties included doing bookings at the county jail, was the State's next witness. She initially testified outside the presence of the jury. The State presented Guth with proposed Exhibit 22, which was a report generated from the jail's database showing the personal information of an inmate booked at the county jail. Guth identified the inmate in the report as Searcy. She explained that Searcy's report stated that he was living on Shelbourne Court with his relative, Leisa Adams. When pressed on cross-examination, Guth stated that she was unsure if she was the one who did the intake for Searcy. Following this testimony, Searcy argued that the report introduced through Guth's testimony was inadmissible hearsay. The trial court admitted the evidence, the

testimony and the exhibit, under WIS. STAT. § 908.03(6) (2003–04).[1] Guth then testified in front of the jury consistent with her prior testimony.

¶ 9. Following Guth, the State called the police officers who investigated the DuRocher burglary and also called Lauri DuRocher. Brian Smith, a Town of Mount Pleasant police officer, testified that on July 17, 2001, he was called to the DuRochers' home for a possible burglary. He stated that when he entered the home through the front door, it appeared as though someone had kicked the door in—the door and the frame around the door were broken and there was a footprint on the door.

¶ 10. Lauri DuRocher testified that she had not given anyone consent to enter the home and that several pieces of jewelry and a pillowcase were taken from her home. She testified that she and her husband were able to identify the items taken from their home from photographs shown to them by the police.

¶ 11. Mark Sorenson, an investigator with the City of Racine Police Department, then testified about the circumstances surrounding Searcy's arrest and the search of Adams' apartment. Sorenson testified that on July 27 he and other members of the police department's Street Crimes Unit were conducting surveillance in the area of Shelbourne Court because they had received a tip from an informant that Searcy was living in the area. Sorenson stated that the officers spotted Searcy and subsequently took him into custody at gunpoint. According to Sorenson, while the officers were still at the scene, a large crowd gathered and "one lady in the crowd came up and said that she was Mr.

---

[1] All references to the Wisconsin Statutes are to the 2003–04 version unless otherwise noted.

Searcy's cousin, and that he was staying with her in the neighborhood there." The following exchange then took place between the prosecutor and Sorenson:

[Prosecutor]: When she provided this information to you, could you describe her demeanor when she gave the statement to you?

[Sorenson]: Um, rather excited.

[Prosecutor]: How so?

[Sorenson]: We had just taken Mr. Searcy into custody at gunpoint and she started screaming, um, wanted to know what we are doing and saying "that's my cousin, you can't do that." She was rather excited in that way.

[Prosecutor]: During this time period when she was excited did she provide or make any statements which led you to believe that Mr. Searcy resided at a particular location?

[Sorenson]: Yes.

[Prosecutor]: What information did she provide to you?

At that point, Searcy's counsel objected on hearsay grounds. The State responded that it was admissible pursuant to the excited utterance hearsay exception. After hearing arguments outside the presence of the jury, the trial court allowed the State to continue with its line of questioning.

¶ 12.   The State asked Sorenson how much time had passed between when the officers took Searcy into custody with weapons displayed and when Adams approached the officers and made the statements. Sorenson replied that it had been maybe a minute or two. Then the State again asked, "And during this time

817

period did she provide you again—did she provide you with information as to where Mr. Searcy resided?" Over Searcy's objection, Sorenson quoted Adams as saying, "[s]he said—she—that he had been staying with her from time to time." The trial court overruled Searcy's objection.

¶ 13. According to Sorenson, approximately thirty to forty-five minutes later, the officers obtained Adams' permission to search her apartment, which was located on Shelbourne Court. Sorenson indicated that during the course of the search another investigator directed his attention to a pillowcase found in the closet in an upstairs bedroom. The pillowcase was white with a flower pattern on it and was secured with a knot. The pillowcase contained numerous pieces of jewelry. Sorenson noted that the pillowcase did not match the bedding in the apartment bedroom. Sorenson testified that after locating the pillowcase, he confronted Adams and asked her if she owned the pillowcase.

¶ 14. On redirect examination, the following exchange between the prosecutor and Sorenson took place:

> [Prosecutor]: Defense counsel asked you whether or not you found any items belonging to Mr. Searcy in the closet. Did you receive any information as to the ownership of that pillowcase?
>
> [Sorenson]: No, not to my knowledge.
>
> [Prosecutor]: Did anyone claim ownership?
>
> [Sorenson]: No.
>
> [Prosecutor]: Did anyone deny ownership?

At that point, Searcy's counsel objected on hearsay grounds. The trial court permitted Sorenson to answer

the question. Sorenson responded, "Ms. Adams denied ownership." Following an off-the-record conversation with both counsel, the court instructed the jury to disregard Sorenson's answer. The court stated, "His answer should have been, and he could have given the answer, was: No, no one claimed ownership." Later, during its recitation of its instructions to the jury, the court stated: "During the trial the Court ordered certain testimony be stricken. Disregard all stricken testimony."

¶ 15.  Searcy then called his only witness, Kimberly Jackson, a friend of two years. Jackson testified that she dropped Searcy off at the Hoffman home on two occasions in the months prior to the burglary. She stated that on both occasions Searcy rang the doorbell, a white woman answered and Searcy entered the home. Jackson could not provide exact dates, days of the week, a precise description of the home, or any more detail about the woman who allowed Searcy to enter the home. Jackson testified that she had been twice convicted of a crime.

¶ 16.  The State called Michelle Hoffman as its rebuttal witness. Michelle testified that there were no other adult white females living at the Hoffman residence during that time and she did not allow any adult African-American males, including Searcy, to enter her home during that time. She testified that her employment with the Department of Corrections would prohibit her from having any sort of relationship with a convicted felon.

¶ 17.  Following deliberations, the jury found Searcy guilty of committing the two burglaries in violation of Wis. Stat. §§ 943.10, 939.05 and 939.62.

¶ 18.  On March 22, 2003, juror Rhonda Szabo contacted Searcy's trial attorney. Szabo indicated that

she felt the jury was prejudiced against Searcy because he was African-American. She also informed Searcy's counsel that certain members of the jury during the evening after the first hearing went back to their homes and checked "CCAP"[2] to find out what Searcy had been convicted of in the past and that the jury considered the information during deliberations. Searcy's trial attorney brought this information to the trial court's attention at the sentencing hearing, but the court ruled that the matter should be left for appellate counsel to pursue. In May 2004, Searcy filed a postconviction motion. He asked the court to vacate his sentence and conviction and order a new trial, arguing that the jury received improper extraneous information prior to or during deliberations.

¶ 19. The trial court held a hearing on the motion on September 24, 2004. Szabo testified that on the day of the trial she had heard jurors discussing Searcy's prior burglaries at Kewpee's, a restaurant where the jurors dined. She stated that while the jurors never mentioned CCAP, she assumed the jurors must have obtained the information concerning the prior convictions from CCAP. Szabo also testified that during deliberations a juror had stated something like, "[L]ook, this isn't the first time he's done this, you know, he has robbed or burglarized before." She expressed concern over there being racial bias amongst the jurors. She testified that she cried after the jury convicted Searcy because she thought what happened in the jury room was inappropriate. She testified that she did not believe

---

[2] "CCAP" stands for Consolidated Court Automation Programs. *See* http://wcca.wicourts.gov/index.xsl. The CCAP website provides public access to the records of the Wisconsin circuit courts under Wisconsin's open records law. *Id.*

that Searcy had committed the burglaries and that she did not like being in a position to judge an individual.

¶ 20. The trial court denied Searcy's postconviction motion. The court stated:

> [S]o what we have is a juror who's disgruntled after leaving the court process, has second thoughts and that certainly colors her testimony, her perspective. She obviously at this point doesn't believe the defendant is guilty, is second[-]guessing her own decision to find him guilty and to agree that he was guilty.

The court found it difficult to "put a lot of credibility on what she says based upon the inconsistencies in her statements and her perspective as a juror who has obviously changed her mind and wants to [e]ffect, quite frankly, a different result." The court then concluded that there was not clear and convincing evidence to establish that extraneous information in the form of the prior convictions was brought to the attention of the jurors.

## II. DISCUSSION

### A. Sufficiency of the Evidence

¶ 21. Searcy maintains that the State did not present sufficient evidence for the jury to find him guilty of the DuRocher and Hoffman burglaries. Burglary, as defined in Wis. Stat. § 943.10, "is committed by one who intentionally enters a building without the consent of the person in lawful possession and with intent to steal." Wis JI—Criminal 1421 (footnote omitted).

¶ 22. Our task in reviewing the sufficiency of the evidence is to determine whether the evidence at trial, viewed most favorably to the State and to the convic-

tion, is so insufficient in probative value and force that it can be said as a matter of law that no trier of fact acting reasonably could have found guilt beyond a reasonable doubt. *State v. Poellinger*, 153 Wis. 2d 493, 501, 451 N.W.2d 752 (1990). In doing so, we must keep in mind that the credibility of the witnesses and the weight of the evidence is for the trier of fact, and we must adopt all reasonable inferences which support the jury's verdict. *Id.* at 504. The test is not whether this court is convinced of Searcy's guilt beyond a reasonable doubt, but whether this court can conclude that the trier of fact could, acting reasonably, be so convinced by evidence it had a right to believe and accept as true. *See id.* at 503–04. Furthermore, although the evidence presented at trial may have been circumstantial, circumstantial evidence is often stronger and more satisfactory than direct evidence, and a finding of guilt may rest entirely on circumstantial evidence. *Id.* at 501–02. The standard for reviewing the sufficiency of the evidence is the same in either a direct or a circumstantial evidence case. *Id.* at 501. In short, Searcy bears a heavy burden in attempting to convince us to set aside the jury's verdict. *See State v. Allbaugh*, 148 Wis. 2d 807, 808–09, 436 N.W.2d 898 (Ct. App. 1989).

¶ 23.   Searcy claims the only evidence linking him to the Hoffman burglary was his fingerprint on the window screen in the Hoffmans' bedroom. He argues that the mere presence of his fingerprint, standing alone, is insufficient to connect him to the burglary. Because there is other evidence supporting Searcy's conviction, we need not decide whether fingerprint evidence, standing alone, is sufficient to sustain a burglary conviction. *See State v. Scott*, 2000 WI App 51, ¶ 16, 234 Wis. 2d 129, 608 N.W.2d 753 (refusing to address defendant's argument that fingerprint evidence

standing alone was insufficient to survive a motion to dismiss because the State presented other evidence as well).

¶ 24.   Darrin Hoffman testified that he had not given anyone permission to take the items stolen from his home. Darrin stated that when he came home and discovered that the burglary had occurred, his front screen door and interior door were open and some of the framework was broken. He also found the bedroom window screen "mangled" and lying on the bed. He testified that the only way to remove the window screen was from inside the house.

¶ 25.   Darrin's assertions as to the conditions of the doorframe and window screen were corroborated by the testimony of the officers called to the scene. Ashbeck testified that when he arrived at the Hoffman residence he noticed that the front door appeared to be kicked in, as there was a footprint on the door, and the window screen was "all bent" and lying on the bed. The testimony of several officers then established that the fingerprint lifted from the window screen positively matched Searcy's left thumb and a palm print matched his print to a reasonable degree of professional certainty. The jury could have reasonably concluded from the presence of the fingerprint evidence when combined with the damage to the doors and window screen and the fact that the window screen could only be opened from the inside that Searcy had burglarized the Hoffman home.

¶ 26.   Searcy attempted to provide an innocent explanation for the presence of his fingerprint through the testimony of his friend, Jackson. Jackson testified that she had dropped Searcy off at the Hoffman home and had seen a white woman let him in on more than

one occasion. However, Jackson could not provide exact dates, days of the week, a precise description of the home, or any more detail about the woman who allowed Searcy to enter the home, and Jackson admitted that she had been twice convicted of a crime. Furthermore, on rebuttal, Michelle Hoffman testified that she did not know Searcy, she had not allowed an African-American male to enter her home around that time and her employment with the Department of Corrections would preclude her from having a relationship with a convicted felon. The jury was certainly well within its rights to (1) adopt as credible the testimony of Michelle, a Department of Corrections employee, that Searcy's fingerprint had no business being in the Hoffman bedroom and (2) reject as incredible the imprecise testimony of Jackson, a friend of Searcy's with a criminal history, that there was an innocent explanation for the presence of the fingerprint.[3] *See State v. Toy*, 125 Wis. 2d 216, 222, 371 N.W.2d 386 (Ct. App. 1985) ("It is the jury's task . . . not this court's, to sift and winnow the credibility of the witnesses.").

---

[3] Searcy argues that even if the jury had concluded that he had put Jackson on the stand to provide false testimony in order to wrongly support his claim of innocence, this would not be enough to support his conviction for the Hoffman burglary. His argument is based on the rule that a negative inference from a fabricated alibi is not proof of the elements of a crime. *See Stewart v. State*, 83 Wis. 2d 185, 193, 265 N.W.2d 489 (1978) (concluding that "a negative inference drawn from the witnesses' testimony is, standing alone, insufficient to support a conviction and . . . there must be independent support in the evidence for what is inferred"); *Peters v. State*, 70 Wis. 2d 22, 30–31, 233 N.W.2d 420 (1975). However, as the State points out, even if the jury concluded that Searcy's alibi was false, it was not the only evidence against him.

¶ 27.   Searcy contends that the only evidence connecting him to the DuRocher burglary was the pillowcase full of stolen items discovered in Adams' home and that this was insufficient to support his conviction. He maintains that sustaining his conviction for this burglary would be the equivalent of affirming a conviction if the State merely produces any relevant evidence of guilt in violation of the principles articulated in *Jackson v. Virginia*, 443 U.S. 307, 318–20 (1979). Searcy fails to consider all the relevant evidence the State presented.

¶ 28.   One of the officers, Smith, testified that on July 17, 2001, he was called to the DuRocher home for a possible burglary. Smith stated that it appeared as though someone had kicked in the door because the door and its frame were broken and there was a footprint on the door. Sorenson testified that ten days later, on July 27, he arrested Searcy. He stated that Adams informed police that Searcy, who was her cousin, had been staying with her from time to time.[4] Adams permitted the officers to search her home. Sorenson stated that while searching Adams' bedroom closet, the officers found a pillowcase secured with a knot. According to Sorenson, the pillowcase did not match the sheets on the bed and contained several pieces of jewelry. Sorenson testified that no one claimed ownership of the pillowcase. Lauri DuRocher identified the pillowcase

---

[4] Searcy challenges the admission of Adams' statements to the police concerning his residence through Sorenson's testimony. However, as is shown in Part II, section C of our discussion, the trial court properly admitted the statements and we consider them in our analysis of Searcy's sufficiency of the evidence challenge. We will not consider Adams' statement to the police in which she denied ownership of the DuRocher pillowcase.

and several of the items as ones that had been stolen from her home. DuRocher testified that she did not know Searcy and she had not given anyone permission to remove the items from her home.

¶ 29.  From this evidence the jury could have reasonably come to the conclusion that Searcy was responsible for the DuRocher burglary. The stolen items were found in a home where he was staying only ten days after the burglary occurred. Additionally, no one claimed ownership of the items and the items were found tied up in a pillowcase and hidden in a closet. The jury could have reasonably drawn the inference that Searcy had stolen the items and tried to conceal them in his cousin's closet.

¶ 30.  Finally, the jury could have relied on the similarities between the two burglaries to convict Searcy. In both cases, the front door had apparently been kicked in—there was damage to the doors and their frames, and footprints on the doors themselves. Further, in both burglaries, pillowcases were taken off of beds, most likely to transport stolen property. From the similarities, the jury could have concluded that the same person committed both burglaries and the burglar's modus operandi was, in part, to kick in the door and place stolen items in a pillowcase from the residence. Thus, the consistencies between both burglaries bolster our conclusion that the evidence presented at trial was sufficient to convict Searcy of both the Hoffman and DuRocher burglaries.

## B. Extraneous Information

¶ 31.  We next address Searcy's claim that extraneous prejudicial information was improperly brought

to the jury's attention. He maintains that the jury became aware of his prior burglary convictions through a juror's research on CCAP.

¶ 32.   Under Wis. Stat. § 906.06(2), the party seeking to impeach the verdict must demonstrate that a juror's testimony is admissible by establishing that:   (1) the juror's testimony concerns extraneous information (rather than the deliberative process of the jurors), (2) the extraneous information was improperly brought to the jury's attention, and (3) the extraneous information was potentially prejudicial.[5] *State v. Eison*, 194 Wis. 2d 160, 172, 533 N.W.2d 738 (1995). Here, the trial court implicitly determined that Searcy had met his initial three-pronged burden under § 906.06(2) and therefore Szabo was competent to testify in an inquiry into the validity of the guilty verdict. On appeal, the State does not challenge this implicit determination.

¶ 33.   If, as here, the defendant meets the threshold burden of showing juror competency to testify under Wis. Stat. § 906.06(2), the trial court must con-

---

[5] Wisconsin Stat. § 906.06(2) provides:

(2) Inquiry into validity of verdict or indictment. Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon the juror's or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes in connection therewith, except that a juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror. Nor may the juror's affidavit or evidence of any statement by the juror concerning a matter about which the juror would be precluded from testifying be received.

duct two additional analyses to decide if a new trial is warranted. *See State v. Broomfield,* 223 Wis. 2d 465, 479, 589 N.W.2d 225 (1999). First, the trial court must make the "factual determination whether 'one or more jurors made or heard the statements [in question] or engaged in the conduct alleged.' " *State v. Wulff,* 200 Wis. 2d 318, 328, 546 N.W.2d 522 (Ct. App. 1996) (citation omitted), *rev'd on other grounds,* 207 Wis. 2d 143, 557 N.W.2d 813 (1997). The defendant must prove the facts by clear, satisfactory and convincing evidence. *Id.*; *Castaneda v. Pederson,* 185 Wis. 2d 199, 211–12, 518 N.W.2d 246 (1994). A trial court's factual determinations on this first inquiry will not be overturned unless clearly erroneous. *See Broomfield,* 223 Wis. 2d at 479–80 (citing Wis. Stat. § 805.17(2)). If the defendant shows that the alleged statements were made or the alleged conduct occurred, the trial court must determine whether the extraneous information produced prejudice requiring reversal of the verdict. *Broomfield,* 223 Wis. 2d at 479.

¶ 34.   Here, the trial court determined that Searcy failed to establish by clear and convincing evidence that jurors were exposed to prejudicial information concerning Searcy's prior burglary convictions through a juror's research on CCAP.[6] In determining that Searcy had failed to meet his burden, the trial court did not find

---

[6] Searcy seems to make an argument that the trial court erred by focusing on whether the jurors had been exposed to extraneous information through CCAP rather than whether they utilized improper information during their deliberations. However, as our discussion makes clear, after the defendant satisfies his or her threshold burden, the court must "determine by clear, satisfactory, and convincing evidence that the juror made or heard the statements or engaged in the conduct alleged." *State v. Broomfield,* 223 Wis. 2d 465, 479, 589 N.W.2d

Szabo's testimony to be convincing, calling her testimony "less than crystal clear." The court explained that Szabo's testimony was inconsistent and her testimony evidenced a "disgruntled" juror with second thoughts.

¶ 35.   In reviewing findings made by a trial court:

It is well settled that the weight of the testimony and the credibility of the witnesses are matters peculiarly within the province of the trial court acting as the trier of fact. The reason for such deference is the superior opportunity of the trial court to observe the demeanor of witnesses and to gauge the persuasiveness of their testimony.

*Kleinstick v. Daleiden*, 71 Wis. 2d 432, 442, 238 N.W.2d 714 (1976) (footnote omitted). Moreover, when more than one reasonable inference can be drawn from the credible evidence, this court must accept the inference drawn by the trial court. *Noll v. Dimiceli's, Inc.*, 115 Wis. 2d 641, 644, 340 N.W.2d 575 (Ct. App. 1983). The trial court's credibility conclusion in this case finds support in the record.

¶ 36.   Szabo testified that she contacted Searcy's attorney only after checking CCAP and seeing what she perceived to be an error in the number of convictions stemming from the trial. She testified that when she was polled following deliberations she stated that she agreed with the verdict, but when questioned later by detectives she said that she did not believe that Searcy committed the burglary. She testified that "[a]fter the fact" she was not happy with the "whole process"; she did not want to be in a position of judging an individual and she would never be a juror again.

225 (1999). Thus, the trial court properly analyzed whether the jurors had been exposed to information obtained from CCAP.

¶ 37.  She also testified that when she overheard jurors speaking at Kewpee's, it was kind of noisy and she thought she heard one juror say, "[T]his isn't the first time this guy did this," or "[t]here's been more or many or something like that." However, she testified on redirect examination that she thought she heard the word "burglary" used in that conversation, but "that one I wouldn't say 100 percent that that actually happened. I think I heard that." Then, on recross-examination, she stated that she was not "absolutely certain" that the jurors were even talking about the case. She testified that a juror later "implied" during deliberations that he knew that Searcy had been convicted of burglary in the past and she *assumed* the juror who made the comment had researched Searcy on CCAP, but that was merely her own opinion. She testified that no one mentioned CCAP, any prior bad acts, or any prior dates of convictions. She testified that, prior to her taking the witness stand at the motion hearing, she had not told anyone that the statement from the juror was that Searcy had "committed burglaries before."

¶ 38.  Searcy challenges the trial court's finding that Szabo's testimony was incredible in part because she evidenced regret over her decision to convict Searcy. He maintains that Szabo's regret makes her testimony more credible because she came forward even though her testimony did not "portray her in the best of lights." While this may be a reasonable inference that can be drawn from her testimony, we are bound to accept the equally reasonable inference drawn by the trial court. *See id.*

¶ 39.  In light of the ambiguous, indefinite and equivocal nature of Szabo's testimony, the trial court was well within its rights to reject her testimony as

incredible and conclude that Searcy failed to prove by clear, satisfactory and convincing evidence that the jury had been exposed to extraneous prejudicial information concerning Searcy's prior convictions.[7] Because we uphold the trial court's determination on this point, we need not address the question of whether the jury's exposure to extraneous information constitutes prejudicial error requiring reversal of the verdict.

## C. Constitutional Challenge

¶ 40. Based on the United States Supreme Court's *Crawford* decision, Searcy argues that he deserves a new trial because his constitutional right to confront his accusers was violated when the trial court admitted, through Sorenson's testimony, Adams' statements tying him to her residence and the stolen items from the DuRocher burglary. Searcy contends that Adams' statements were "testimonial" in nature because they were the result of a police effort to create evidence for trial. Searcy also alleges that the admission of Guth's testimony concerning the information in his county jail intake records violated his confrontation rights because he did not have an opportunity to cross-examine the individual who provided the information.

¶ 41. We will begin our discussion of Searcy's constitutional challenge with an overview of the principles from Confrontation Clause jurisprudence that

[7] Szabo testified that she thought that Searcy's race played a role during the jury's deliberations. However, Searcy does not raise a race-based challenge on appeal. In any event, the trial court's credibility determination, which we accept, extinguishes such a challenge.

831

will guide our analysis. We will then apply the principles to Adams' challenged statements and Guth's testimony separately.[8]

### 1. Confrontation Clause General Principles

¶ 42.   When a defendant asserts a Confrontation Clause challenge, we first must determine whether the challenged statements are admissible under the rules of evidence. *See State v. Manuel*, 2005 WI 75, ¶ 23, 281 Wis. 2d 554, 697 N.W.2d 811. A trial court's decision to admit evidence is discretionary, and this court must uphold that decision if there was a proper exercise of discretion. *Id.*, ¶ 24. If the statements are not admissible under the rules of evidence, they are excluded, and we need not proceed to the constitutional question. *State v. Tomlinson*, 2002 WI 91, ¶ 41, 254 Wis. 2d 502, 648 N.W.2d 367. If admissible, however, the next step is to examine whether admission of the statements violated the defendant's right to confront his or her accusers. *See Manuel*, 281 Wis. 2d 554, ¶ 25. Whether admission of hearsay evidence violates a defendant's right to confrontation presents a question of law we review de novo. *Id.*

¶ 43.   *Crawford* spurred a major shift in Confrontation Clause jurisprudence. Until *Crawford*, *Ohio v. Roberts*, 448 U.S. 56 (1980), governed a Sixth Amend-

---

[8] The State argues that Searcy waived review of this issue because he failed to object to the testimony of Adams and Guth on constitutional grounds. However, Searcy could not have raised at trial a Confrontation Clause claim based on *Crawford v. Washington*, 541 U.S. 36 (2004), because his December 2002 trial preceded the March 2004 *Crawford* decision by well over a year. *See State v. Savanh*, 2005 WI App 245, ¶ 11 n.2, 287 Wis. 2d 876, 707 N.W.2d 549.

ment challenge to the admission of an out-of-court statement against the accused. Under *Roberts*, a hearsay statement could be admitted in a criminal trial without violating the right of confrontation if (1) it was shown that the declarant was unavailable and (2) the out-of-court statement bore adequate indicia of reliability. *Id.* at 66. This test focused on the reliability of the statement. As the Court explained, a statement had adequate indicia of reliability if it either fell within a firmly rooted hearsay exception or if it bore "particularized guarantees of trustworthiness." *Id.* (footnote omitted). The *Crawford* Court expressed the concern that *Roberts* had fostered an overemphasis on reliability that oftentimes bore little relation to the abuses the Confrontation Clause targeted, *Crawford*, 541 U.S. at 51, leading to "unpredictability" and "unpardonable" constitutional error. *Id.* at 63.

¶ 44.  Accordingly, *Crawford* reoriented the focus of Confrontation Clause claims from reliability back to confrontation. *State v. Savanh*, 2005 WI App 245, ¶ 19, 287 Wis. 2d 876, 707 N.W.2d 549. The focus now is on the "testimonial" or "nontestimonial" nature of the out-of-court statements:  "Where testimonial statements are at issue, the only indicium of reliability sufficient to satisfy constitutional demands is the one the Constitution actually prescribes:  confrontation." *Crawford*, 541 U.S. at 68–69. Regardless of their reliability, therefore, out-of-court testimonial statements are barred under the Confrontation Clause unless (1) the declarant is unavailable and (2) the defendant had a prior opportunity to cross-examine the witness. *Id.* at 68.

¶ 45.  The *Crawford* Court, however, did not dispense with the *Roberts* reliability rubric entirely. *See*

*Manuel*, 281 Wis. 2d 554, ¶ 60. The *Roberts* test still governs a Sixth Amendment Confrontation Clause challenge to the admission of nontestimonial out-of-court statements. *Manuel*, 281 Wis. 2d 554, ¶ 60.

2. Adams' Statements Concerning Searcy's Residence

¶ 46.   Searcy challenges the admissibility of Adams' statements to police officers within minutes of his arrest that he was her cousin and was staying with her. As indicated, we first must determine whether the statements are admissible under the rules of evidence.

¶ 47.   The trial court apparently determined that Adams' statements were admissible under the excited utterance hearsay exception found in Wis. Stat. § 908.03(2). An excited utterance admissible under § 908.03(2) is "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." When applying this statute to hearsay statements offered at trial, the trial court considers the spontaneity of the statements, the stress of the incident provoking the statements, and the lapse of time between the triggering event and the utterance. *State v. Moats*, 156 Wis. 2d 74, 97, 457 N.W.2d 299 (1990). "The statements of a declarant who demonstrates the opportunity and capacity to review [the underlying incident] and to calculate the effect of his [or her] statements do not qualify as excited utterances." *Christensen v. Economy Fire & Cas. Co.*, 77 Wis. 2d 50, 58, 252 N.W.2d 81 (1977) (footnote omitted). A declarant's availability as a witness is immaterial under § 908.03(2). *See* § 908.03 (stating that certain types of statements, including excited utterances, "are not excluded by the hearsay rule, even though the declarant is available as a witness").

¶ 48. Here, Adams' statements were properly admitted under the excited utterance hearsay exception. Adams spontaneously made the statements, without police prompting, under the stress of watching her cousin being taken into custody at gunpoint. It was only one to two minutes after Searcy's arrest that Adams emerged from the crowd that had gathered to witness the arrest and yelled, "[T]hat's my cousin, you can't do that." She then told officers that Searcy had been staying with her "from time to time." According to Sorenson, she was "excited." She simply did not have the opportunity or capacity to review the situation and calculate the likely impact of her statements.

¶ 49. Because we have determined that Adams' statements to the officers concerning Searcy's residence were admissible under the rules of evidence, we turn to whether their admission violated Searcy's right to confrontation. *See Manuel*, 281 Wis. 2d 554, ¶ 25. With the *Crawford* framework in mind, our first task is to assess whether Adams' out-of-court statements were testimonial.

¶ 50. While the *Crawford* Court limited the case's reach to "testimonial" statements, it opted to "leave for another day any effort to spell out a comprehensive definition of testimonial." *Crawford*, 541 U.S. at 68 (footnote omitted). Instead, it laid out three "formulations of this core class." *Id.* at 51. We summarize them here: (1) ex parte in-court testimony or its functional equivalent, such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially; (2) extrajudicial statements contained in for-

835

malized testimonial materials, such as affidavits, depositions, prior testimony, or confessions; and (3) statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial. *Id.* at 51–52. These three formulations contemplate a measure of formality that gives the declarant some indication of the statement's significance. *Savanh*, 707 N.W.2d 549, ¶ 22. The text of the Confrontation Clause contemplates "witnesses . . . bear[ing] testimony," and "testimony" typically means a "solemn declaration or affirmation made for the purpose of establishing or proving some fact." *Crawford*, 541 U.S. at 51 (citation omitted); *Savanh*, 707 N.W.2d 549, ¶ 22.

¶ 51.   Adams' statements to the police officers do not fall into any of the identified categories of testimonial statements. Her informal statements do not fit within the contours of the first two depictions:   they are not "ex parte in-court testimony or its functional equivalent" nor are they "extrajudicial statements . . . contained in formalized testimonial materials." *Crawford*, 541 U.S. at 51–52 (citation omitted). The record shows that the remarks were spontaneous, unsolicited statements offered to police officers immediately following the trauma of her cousin's arrest at gunpoint. Adams' statements simply bear no indicia common to the official and formal quality of the various types of statements described in the first two *Crawford* formulations.

¶ 52.   The only depiction even arguably applicable is the third, which relates to statements an objective witness reasonably would believe would be available for use at a later trial. *Id.* at 52. We conclude that an objective witness in Adams' position would not have reasonably expected that the statements would be used

836

in a future judicial proceeding. A number of factors support this determination.

¶ 53. Adams initiated the interaction with the officers; the police did not seek her out. She approached the police officers after they had arrested her cousin at gunpoint. Her statements to the police officers concerning her relationship to Searcy and Searcy's residence were voluntarily made in the course of her attempting to prevent the police from taking her cousin into custody. She yelled at the officers, "[T]hat's my cousin, you can't do that," and said that Searcy had been staying with her "from time to time." Sorenson testified that when Adams approached them she was "excited." There is no evidence in the record demonstrating that the statements were made in response to a tactically structured police interrogation, or in response to any questioning at all. Given the informal, unstructured nature of the interaction, Adams could not have reasonably anticipated that she was bearing witness and her utterances could impact future legal proceedings.

¶ 54. We are not persuaded by Searcy's contention that the officers obtained the information from Adams with an eye toward his prosecution and therefore the statements were testimonial. Searcy points out the concern in *Crawford* and *Lilly v. Virginia*, 527 U.S. 116 (1999), a pre-*Crawford* decision he cites, that the "[i]nvolvement of the government officers in the production of testimony with an eye toward trial presents unique potential for prosecutorial abuse." *Crawford*, 541 U.S. at 56 n.7; *see also Lilly*, 527 U.S. at 125 (statements obviously obtained by government for purpose of creating evidence that would be useful at a future trial). As we have recently stated, "Underlying this concern . . . is the actual or perceived pressure on the declarant as a

result of the government involvement in producing testimony with an eye toward trial." *Savanh*, 707 N.W.2d 549, ¶ 28; *see also Crawford*, 541 U.S. at 56 n.7; *Lilly*, 527 U.S. at 139 (expressing concern that declarant was primarily "responding to the officers' leading questions, which were asked without any contemporaneous cross-examination by adverse parties"). However, neither that type of government involvement nor any potentially coercive effect on the declarant was present here. Unlike *Crawford* and *Lilly*, where the declarants had been subjected to police interrogation, *see Crawford*, 541 U.S. at 38, 40; *Lilly*, 527 U.S. at 121, Adams volunteered her statements to the officers absent any interrogation or other police prompting. Rather, like the foreign cases the State cites in its brief, Adams' statements were offered unsolicited by a victim or witness at the scene of a traumatic event, and were not generated by the desire of the prosecution or police to seek evidence against a particular suspect.[9] *See, e.g., People v. Corella*, 18 Cal. Rptr. 3d 770, 776 (2004)

[9] We recognize that in determining whether a particular out-of-court hearsay statement is testimonial or nontestimonial in the post-*Crawford* era, courts in other jurisdictions have reached conflicting decisions under same or similar circumstances. *Davis v. State*, 169 S.W.3d 660, 668–69 (Tex. Ct. App. 2005); *compare Lopez v. State*, 888 So. 2d 693, 695, 700 (Fla. Dist. Ct. App. 2004) (holding that a victim of assault and kidnapping, although upset and nervous, made testimonial statements to officers at the scene immediately after the crime had been committed) *with Anderson v. State*, 111 P.3d 350, 351 (Alaska Ct. App. 2005) (holding that an assault victim's statement to police at the scene of the crime was nontestimonial); *compare Key v. State*, 173 S.W.3d 72, 73, 76 (Tex. Ct. App. 2005) (holding that the excited utterance exception to the hearsay rule had been satisfied and, thus, as a matter of law, the victim's statements to police at the scene were nontestimonial) *with*

(holding that statements made under such circumstances were nontestimonial); *State v. Forrest*, 596 S.E.2d 22, 26–27 (N.C. Ct. App. 2004), *aff'd by per curiam*, 611 S.E.2d 833 (N.C. 2005) (same). Adams' statements were nontestimonial.[10]

---

*Drayton v. United States*, 877 A.2d 145, 149–50 (D.C. 2005) (rejecting view that excited utterances are per se nontestimonial).

We also are aware that the United States Supreme Court recently accepted cases for review that bear upon the testimonial versus nontestimonial inquiry where excited utterances are involved. *State v. Davis*, 111 P.3d 844 (Wash. 2005), *cert. granted*, 126 S. Ct. 547 (U.S. Oct. 31, 2005) (No. 05–5224), *available at* http://www.supremecourtus.gov/docket/05–5224.htm (whether an alleged victim's statements to a 911 operator admitted under the excited utterance hearsay exception are testimonial); *Hammon v. State*, 829 N.E.2d 444 (Ind. 2005), *cert. granted*, 126 S. Ct. 552 (U.S. Ind. Oct. 31, 2005) (No. 05–5705), *available at* http://www.supremecourtus.gov/docket/05–5705.htm (whether an oral accusation made to an investigating officer at the scene of an alleged crime is a testimonial statement). We note, however, that most of the post-*Crawford* cases reviewing the issue have held that initial police-victim or police-witness interaction at the scene of an incident is not an interrogation intended to produce evidence for trial and admission of testimony about that interaction does not offend the Confrontation Clause. *See, e.g., Anderson*, 111 P.3d at 354 n.26 (compiling cases from several jurisdictions); *Key*, 173 S.W.3d at 74–75 (same); *Spencer v. State*, 162 S.W.3d 877, 882 (Tex. Ct. App. 2005) (same).

[10] Searcy complains that any statements Adams made to Sorenson about her precise street address and apartment number should have been excluded on confrontation grounds. However, Sorenson did not testify to any statements Adams may have made about her exact address. Further, as the State observes, the trial record fails to show how this information was communicated to the police and Searcy failed to object on any basis to Adams' communication of her address to the police. We therefore cannot analyze the constitutionality of the admission of the information.

¶ 55. Because we have determined that Adams' out-of-court statements were nontestimonial, the next stage of the admissibility analysis is the two-part *Roberts* test. We hold that part one of the *Roberts* test, Adams' unavailability, is satisfied. For reasons not made clear to this court, Adams did not testify at trial, and the parties and the trial court seemed to accept her absence as a settled matter. Further, the Confrontation Clause does not require proof of unavailability when the declarant's statement qualifies as an out-of-court excited utterance. *See White v. Illinois*, 502 U.S. 346, 355–57 (1992); *Tomlinson*, 254 Wis. 2d 502, ¶ 46 n.7.

¶ 56. We hold that the second part, whether Adams' statements bear adequate indicia of reliability, also is satisfied. Generally when evidence is admissible under a firmly rooted hearsay exception, such as the excited utterance exception, the Confrontation Clause has been satisfied and no further showing of particularized guarantees of trustworthiness is required. *State v. Ballos*, 230 Wis. 2d 495, 510, 602 N.W.2d 117 (Ct. App. 1999) (citing *White*, 502 U.S. at 350 n.1, 356–57). Such evidence may be excluded, however, "if there are unusual circumstances warranting its exclusion." *Ballos*, 230 Wis. 2d at 510 (citation omitted). Searcy has offered nothing to suggest any "unusual circumstances" or "even the slightest taint of unreliability" that would require exclusion. *See id.* (citations omitted). Adams' initial statements to the police officers were admissible.

3. Adams' Statements Concerning the Pillowcase

¶ 57. Searcy also challenges the admissibility of Adams' statements denying ownership of the pillowcase

containing items from the DuRocher burglary. Searcy claims that Adams' self-serving denial of ownership of the pillowcase was an inadmissible testimonial statement. However, even if the statements were inadmissible hearsay or testimonial statements violating Searcy's confrontation rights, the error in admitting the statements, if any, was harmless.

¶ 58. A Confrontation Clause violation does not result in automatic reversal but rather is subject to a harmless error analysis. *State v. Weed*, 2003 WI 85, ¶ 28, 263 Wis. 2d 434, 666 N.W.2d 485. Our supreme court recently explained that an error is harmless if the beneficiary of the error proves beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained. *State v. Hale*, 2005 WI 7, ¶ 60, 277 Wis. 2d 593, 691 N.W.2d 637.

¶ 59. The trial court instructed the jury to disregard Sorenson's response to the question about who denied ownership of the pillowcase and later gave a curative instruction to the jury again explaining that the jury was to disregard any stricken testimony. We assume that " 'a properly given admonitory instruction is followed' . . . and that the 'jury acted according to law.' " *State v. Pitsch*, 124 Wis. 2d 628, 644 n.8, 369 N.W.2d 711 (1985) (citations omitted). We recognize that cases may arise in which the risk of prejudice inhering in material put before the jury may be so great that even a limiting instruction will not adequately protect a criminal defendant's constitutional right, *see id.*; the present case does not fall within this category. The jury had evidence before it demonstrating that Searcy lived with Adams, that the pillowcase was found tied in a knot and hidden in a closet, and that the

pillowcase and the stolen items it contained were from the DuRochers' home. We, therefore, conclude that the error, if any, in admitting Adams' testimony concerning the pillowcase was harmless beyond a reasonable doubt.

### 4. Guth's Testimony

¶ 60. Searcy also challenges Guth's testimony that the intake records show him as residing with Adams. Searcy argues that Guth's testimony was inadmissible hearsay and he was unable to confront whoever told the booking agent that he was staying with Adams. He agrees, however, that he could have provided this information during his intake or that other law enforcement officers could have provided this information to the booking agent.

¶ 61. We conclude that regardless of whether the testimony violated the rules of evidence or Searcy's confrontation rights, the error in admitting Guth's testimony, if any, was harmless beyond a reasonable doubt. *See Weed*, 263 Wis. 2d 434, ¶ 28 (confrontation challenges subject to harmless error analysis). We have already concluded that the location of Searcy's residence came into evidence via Sorenson's testimony without violating the rules of evidence or Searcy's constitutional right to confront his accusers. The jury therefore had before it information gratuitously provided by Adams establishing that Searcy lived with her.

### III. CONCLUSION

¶ 62. In sum, we reject all three of Searcy's challenges to his conviction. There was sufficient evidence from which the jury could find beyond a reasonable

doubt that Searcy had committed both the Hoffman and DuRocher burglaries. The trial court did not err in concluding that Searcy had failed to offer clear, satisfactory and convincing evidence showing that the jury had been exposed to extraneous prejudicial information. Finally, Searcy's confrontation rights were not violated by the admission, through Sorenson's testimony, of Adams' statements concerning his residence and any error in admitting the other challenged testimony was harmless.

*By the Court.*—Judgment and order affirmed.