# COURT OF APPEALS
## DECISION
## DATED AND FILED

## May 19, 2020

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2019AP389-CR**

Cir. Ct. No. 2016CF5712

STATE OF WISCONSIN

IN COURT OF APPEALS
DISTRICT I

STATE OF WISCONSIN,

PLAINTIFF-RESPONDENT,

V.

BRITTANY S. BAIER,

DEFENDANT-APPELLANT.

APPEAL from a judgment of the circuit court for Milwaukee County: MARK A. SANDERS, Judge. *Affirmed*.

Before Brash, P.J., Dugan and Donald, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1     PER CURIAM. Brittany S. Baier appeals from a judgment of conviction for one count of first-degree intentional homicide and one count of being a felon in possession of a firearm, contrary to WIS. STAT. §§ 940.01(1)(a) and 941.29(1m)(a) (2015-16).[1]   Baier argues that she is entitled to a new trial because a juror downloaded a guide for jury deliberations from the internet and shared it with other jurors during deliberations.[2]  We agree with the trial court that Baier is not entitled to a new trial because the extraneous information that was improperly brought to the jury room would not have had a prejudicial effect on a hypothetical average jury.  Therefore, we affirm.

## BACKGROUND

¶2     Baier was charged with first-degree intentional homicide for the shooting death of her boyfriend, Terrance Tucker.  She was also charged with being a felon in possession of a firearm.  The complaint alleged that Baier told the police that "in the hours preceding the shooting, the two had argued, and [Tucker] beat her."  The complaint continued:  "Later, when he was lying on the basement couch with his gun near his head, she picked up the gun and shot him in the back of the head two or three times."

¶3     The case was tried to a jury.  Baier's defense was that she acted in self-defense when she shot Tucker.

---

[1] All references to the Wisconsin Statutes are to the 2017-18 version unless otherwise noted.

[2] In her opening brief, Baier also argued that the trial court erroneously prohibited certain testimony from an expert witness.  The State argued that Baier forfeited this issue by not adequately raising it at the trial court.  In her reply brief, Baier concedes forfeiture.  Therefore, we will not address this issue.

¶4 The jury was instructed on both first-degree intentional homicide and second-degree intentional homicide, including the law related to self-defense. The trial court told the jury:

> Because the law provides that it is the State's burden to prove all of the facts necessary to constitute a crime beyond a reasonable doubt, you will not be asked to make a separate finding on whether the defendant acted in self-defense. Instead, you will be asked to determine whether the State has established the necessary facts to justify a finding of guilt[y] on first or second degree intentional homicide. If the State does not satisfy you that those facts are established by the evidence, you will be instructed to find the defendant not guilty.

(Some formatting altered.) *See* WIS JI—CRIMINAL 1014 (2003). The trial court explained that to find Baier guilty of first-degree intentional homicide, the State had to prove three elements beyond a reasonable doubt. *See id.* The third element was that Baier "did not actually believe that the force used was necessary to prevent imminent death or great bodily harm to herself." *See id.* To find Baier guilty of second-degree intentional homicide, the third element the State had to prove was that Baier "did not reasonably believe that she was preventing or terminating an unlawful interference with her person or did not reasonably believe that the force used was necessary to prevent imminent death or great bodily harm to herself." *See id.*

¶5 The jury found Baier guilty of first-degree intentional homicide and of being a felon in possession of a firearm. The day after the jury reached its verdict, the trial court contacted the parties concerning multiple copies of a two-page document that was found in the jury room after the trial was completed. The document was entitled, "Beyond Closed Doors[:] A Guide for Jury Deliberations" (hereafter, "Guide"). It contained questions and answers that jurors might ask, such as how to select the presiding juror, how to discuss the evidence, and how to

3

approach the voting process. The document also stated: "This guide was originally developed by the American Judicature Society. With their permission, the Wisconsin Chief Judges' Subcommittee on Juror Treatment and Selection tailored the guide for use in Wisconsin Courts."

¶6 Baier filed a motion seeking a new trial, alleging that "the jurors during deliberations viewed extraneous information that was potentially prejudicial." The trial court conducted an evidentiary hearing where ten of the twelve jurors testified. The trial court followed the procedure for such hearings outlined in WIS. STAT. § 906.06(2) and *State v. Eison*, 194 Wis. 2d 160, 171-73, 533 N.W.2d 738 (1995).

¶7 One of the jurors testified that when the jurors began considering the case on Friday afternoon, the "deliberation was chaotic." The juror explained: "[I]t seemed to be that all of us were new to the jury process and we needed some kind of structure to follow." That weekend the juror looked on the internet and found the Guide. She said she took the Guide to the courthouse on Monday morning, asked a staff person in Jury Management to make copies, and gave those copies to the presiding juror and the other jurors as they arrived.

¶8 The trial court made findings consistent with that juror's testimony. It also found, based on testimony from other jurors, that "[d]ifferent jurors handled [the Guide] differently." The trial court noted that one juror "paid so little attention to it that he did not remember it," while the presiding juror "reviewed it more closely." The trial court said that "after all of the jurors arrived there was a conversation about the substance" of the Guide that was led by the presiding juror. The trial court found that the jurors' discussion about the information in the Guide "was relatively brief[,] lasted no longer than 15 minutes," and included the

presiding juror "explaining that he believed they already had much of the information." The trial court further found: "After that discussion [the Guide] was set aside and deliberations continued. After that initial discussion … it was not discussed further by the jury."

¶9 Having found that there was competent testimony that the jurors had considered extraneous information, the trial court considered "whether the extraneous information constituted prejudicial error requiring reversal of the verdict." *See Eison*, 194 Wis. 2d at 177. The trial court concluded that a new trial was not warranted and denied Baier's motion.

¶10 The trial court subsequently sentenced Baier to a mandatory term of life in prison for the homicide conviction, and it declared her eligible for extended supervision after serving twenty-five years. The trial court imposed a consecutive sentence of fifteen months of initial confinement and twelve months of extended supervision for the firearm conviction. This appeal follows.

## DISCUSSION

¶11 A party seeking to impeach the verdict on grounds that the jury was exposed to extraneous information must demonstrate that: "(1) the juror's testimony concerns extraneous information (rather than the deliberative process of the jurors), (2) the extraneous information was improperly brought to the jury's attention, and (3) the extraneous information was potentially prejudicial." *See State v. Searcy*, 2006 WI App 8, ¶32, 288 Wis. 2d 804, 709 N.W.2d 497; *see also*

WIS. STAT. § 906.06(2).[3] If the moving party meets that threshold burden, then the trial court must make factual findings and decide, as a matter of law, "whether the extraneous information produced prejudice requiring reversal of the verdict." *See Searcy*, 288 Wis. 2d 804, ¶33.

¶12 Neither party challenges the trial court's decision to hold an evidentiary hearing or the trial court's findings, including its finding that the Guide was extraneous information distributed by one juror to the other jurors. Thus, the only issue on appeal is whether the jury's exposure to that extraneous information requires reversal. *See id.*

¶13 *Eison* outlined the analysis that must be undertaken to evaluate potential prejudice, stating:

> [The trial] court must assess, as a matter of law, whether the conviction must be reversed because there is a reasonable possibility that the [extraneous information] would have had a prejudicial effect upon a hypothetical average jury…. [T]he [S]tate "must prove beyond a

---

[3] WISCONSIN STAT. § 906.06(2) provides:

> INQUIRY INTO VALIDITY OF VERDICT OR INDICTMENT. Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon the juror's or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes in connection therewith, *except that a juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror.* Nor may the juror's affidavit or evidence of any statement by the juror concerning a matter about which the juror would be precluded from testifying be received.

(Emphasis added.)

> reasonable doubt that the error complained of did not contribute to the verdict obtained."

*Id.*, 194 Wis. 2d at 177-78 (citations omitted). *Eison* held that courts considering "the possibility of prejudice" must "consider factors such as the nature of the extraneous information, the circumstances under which it was brought to the jury's attention, the nature and character of the [S]tate's case and the defense presented at trial, and the connection between the extraneous information and a material issue in the case." *See id.* at 179.

¶14 On appeal, the question of whether extraneous information could "have had a prejudicial effect on a verdict rendered by a hypothetical average jury" is a question of law this court reviews independently. *See id.* at 178. "We may benefit, however," from the trial court's analysis. *Id.*

¶15 Here, the trial court specifically analyzed the four factors outlined in *Eison* and its progeny. First, the trial court considered "the nature of the extraneous information[.]" *See id.* at 179. The trial court recognized that the two-page Guide has "eight sections" and refers jurors to the jury instructions on five occasions. The trial court observed that other suggestions in the Guide are consistent with specific jury instructions that were read to the jury, such as instructions about selecting the presiding juror.

¶16 Second, the trial court considered "the circumstances under which [the extraneous information] was brought to the jury's attention[.]" *See id.* at 179. The trial court found that the motive of the juror who brought the Guide "into the jury room was not to define the law or not to tell the jurors what to do, but to create some organization to reduce the chaos that she and other jurors perceived had taken place on Friday."

¶17   Third, the trial court discussed "the nature of the [S]tate's case and the defense presented at trial[.]"  In doing so, the trial court recognized that the case involved "complicated burdens of proof with respect to the State's burden to disprove self[-]defense."

¶18   Finally, the trial court analyzed "the connection between the extraneous information and a material issue in the case."  *See* *id.*  The trial court recognized that one of Baier's primary arguments in favor of a new trial was that the Guide "doesn't, explicitly, define the burdens of proof and doesn't, explicitly, define the elements of the offenses."  The Guide offers these suggestions for jurors discussing the evidence and applicable law:

> The judge's instructions will tell you if there are special rules or a set process you should follow.  Otherwise you are free to conduct your deliberations in whatever way is helpful.  Here are several suggestions:
>
> • Look at the judge's instructions that define each charge or claim and list each separate element that make up that charge or claim.
>
> • For each of these elements, review the evidence, both the exhibits and witness testimony, to see if each element has been established by the evidence.
>
> • If there is a lot of evidence, try listing each piece of it next to the elements it applies to.
>
> • Discuss each charge or claim, one at a time.
>
> • Vote on each charge or claim.
>
> • Fill out the verdict form(s) given to you by the judge.

¶19   The trial court rejected Baier's argument that the Guide's suggestions could have led to confusion and caused the jurors to believe "that Ms. Baier had the burden to establish, beyond a reasonable doubt, that she acted in self[-]defense" when "[t]hat's not the burden."  The trial court said:

8

> The Guide certainly does condense things into a very brief form. But in doing so, again, it refers the jury back to the instructions themselves and back to the elements read [and] defined in the instruction. There is not a direct connection between the substance of the Guide and the material issue.
>
> That is, the Guide does not define self-defense differently than the instructions. The Guide does not provide a dictionary definition of what self-defense is that would compete with how it is defined in the instructions. The Guide does not provide some example of what self-defense is and what self-defense isn't that could compete with the definition contained in the instruction. It merely refers the jury back to the instructions.

(Hyphens added, one comma omitted, and "the Guide" substituted for references to "Exhibit 1.") Ultimately, the trial court concluded that the extraneous information was not prejudicial.[4]

¶20 We agree with the trial court's thorough analysis of the four factors outlined in *Eison* and its progeny. The Guide, which is written in general terms, does not provide misinformation about the burden of proof or the elements of the crimes at issue. Instead, it repeatedly directs jurors to follow the trial court's instructions. The Guide also does not suggest that a defendant has the burden of proving a self-defense claim; indeed, it does not even mention self-defense.

---

[4] The trial court originally framed the issue as "whether there is a reasonable probability that the information in the jurors' possession would have had a prejudicial effect upon a hypothetical average juror." However, the "reasonable probability" standard is used in civil cases, not criminal cases. *See Manke v. Physicians Ins. Co. of Wis., Inc.*, 2006 WI App 50, ¶22, 289 Wis. 2d 750, 712 N.W.2d 40 ("In a civil case the prejudice inquiry asks whether there is a reasonable probability that the extraneous information would have a prejudicial effect upon a hypothetical average juror."). Because this is a criminal case, we must consider "whether the conviction must be reversed because there is a reasonable possibility that the [extraneous information] would have had a prejudicial effect upon a hypothetical average jury." *See State v. Eison*, 194 Wis. 2d 160, 177, 533 N.W.2d 738 (1995). In our analysis, we apply the standards outlined in *Eison* for use in criminal cases.

¶21 On appeal, Baier argues that the Guide's lack of references to self-defense or "defenses of any kind" is precisely why the jury's exposure to that extraneous information was prejudicial. Baier asserts that "any juror taking the Guide seriously could believe no consideration of [defenses] was needed." We are not persuaded by this argument. The jury would have to completely ignore the trial court's detailed instructions about self-defense—the primary issue litigated in the case—to conclude that it should not consider self-defense.

¶22 Moreover, as explained above, the jury was instructed that it was "the State's burden to prove all the facts necessary to constitute a crime beyond a reasonable doubt," including the elements of each crime. *See* WIS JI—CRIMINAL 1014. To prove either first-degree or second-degree intentional homicide, the State had to disprove self-defense. *See id.* For instance, with respect to first-degree intentional homicide, the State had to prove beyond a reasonable doubt that Baier "did not actually believe that the force used was necessary to prevent imminent death or great bodily harm to herself[.]" *See id.* Thus, even if a hypothetical juror were to follow the Guide's suggestions to the letter, including determining "if each element has been established by the evidence," the juror would have to consider self-defense in order to determine whether the State established the third element of first-degree or second-degree intentional homicide.

¶23 Baier also faults the Guide for not mentioning "the constitutional requirement of proof beyond a reasonable doubt." We are not persuaded that the lack of a reference to the standard of proof would lead a hypothetical juror to believe there was no burden of proof, especially when the trial court gave the jury specific instructions about the burden of proof.

¶24     For the foregoing reasons, we conclude "that there is no reasonable possibility that the verdict of a hypothetical average jury would have been influenced by the extraneous information improperly brought to the jury's attention." *See **Eison***, 194 Wis. 2d at 181. Because there was no prejudice, Baier is not entitled to a new trial. *See **id.*** We affirm the judgment.

*By the Court.*—Judgment affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.

11