STATE of Wisconsin, Plaintiff-Respondent,

v.

Roberto Vargas RODRIGUEZ, Defendant-Appellant.†

Court of Appeals

*No. 2005AP1265–CR. Submitted on briefs May 1, 2006.*
*—Decided July 28, 2006.*

2006 WI App 163

(Also reported in 722 N.W.2d 136.)

† Petition for review granted 4/17/07.

805

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Donna L. Hintze*, assistant state public defender.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *Peggy A. Lautenschlager*, attorney general, and *Charlotte Gibson*, assistant attorney general.

Before Fine, Curley and Kessler, JJ.

¶ 1. FINE, J. Roberto Vargas Rodriguez appeals judgments convicting him of: one count of battery, *see* WIS. STAT. § 940.19(1); one count of intimidation of a victim, *see* WIS. STAT. §§ 940.45(3) & 940.46; one count of intimidation of a witness, *see* WIS. STAT. §§ 940.42 & 940.46; and two counts of disorderly conduct, *see* WIS. STAT. § 947.01, all as an habitual criminal, *see* WIS. STAT. § 939.62. He also appeals from the trial court's order denying his motion for postconviction relief. He contends that the trial court denied him his right to confrontation by receiving into evidence police-officer testimony of what his alleged victim, Jill LaMoore, and her seven-year-old daughter Casey, told the police, when neither Ms. LaMoore nor Casey testified at the trial. He also claims that the trial court erred in: (1) permitting the State to ask Rodriguez's brother about his membership in a street gang; (2) overruling a

defense objection to the prosecutor accusing Rodriguez of lying during his testimony; and (3) not recusing itself in connection with Rodriguez's postconviction motion asserting that he was prejudiced by his trial lawyer's alleged deficient representation. Rodriguez also argues that he was prejudiced by his trial lawyer's alleged deficient representation when the trial lawyer: (1) did not object when the prosecutor asked the police-officer witnesses whether there was anything else they wanted to tell the jury, and (2) asked one of the police officers whether he believed that Ms. LaMoore was telling the truth when she told him that Rodriguez had attacked her and Casey. We affirm, and analyze in sequence Rodriguez's claims.

## I. CONFRONTATION.

### A.

¶ 2. As we have seen, Rodriguez claims that he was denied his right to confrontation when the trial court permitted police-officer witnesses to testify about what Jill LaMoore and her daughter Casey told the officers, when neither Ms. LaMoore nor Casey testified. We disagree.

¶ 3. The West Allis officers, Brad Sterling and Todd Kurtz, were the first two witnesses called by the State. Sterling told the jury that he went to LaMoore's house in West Allis after midnight because someone had called his department to say that a man was beating a woman there. He said that he arrived within "about a minute of the call at the most," and found Jill LaMoore inside the house: "She was crying. She was breathing very fast. She was hysterical. She stated she was just beat up." Sterling testified that "the right side of her face was red," that "it looked like an injury," and that Ms. LaMoore had "contusions on the top of her head and back of her head."

808

¶ 4. Officer Sterling also testified that Ms. LaMoore told him that Rodriguez had come home around midnight, accused her of infidelity, and kicked her repeatedly, threatening to kill her. According to the officer, LaMoore then called her Rottweiller dog for help, but Rodriguez punched the animal "several times, choked it, threw it against the wall," and then "[g]rabbed [LaMoore] by the hair" and "punched her in the top and back of the head." Sterling testified that LaMoore "was crying the entire time I was talking to her and she would talk very fast."

¶ 5. According to Officer Sterling's recounting of what Ms. LaMoore told him, seven-year-old Casey came into the room during the assault and "yelled to Mr. Rodriguez, 'Stop hitting my mom.' " Rodriguez "then turned and grabbed the seven year old and pushed her hard against the wall." When Ms. LaMoore tried to stop this, and made an unsuccessful attempt to slap Rodriguez, Rodriguez grabbed her "by the shoulders I believe it was or the head, pushed her up against the wall and spit in her face."

¶ 6. Both LaMoore and Casey were able to run out of the house, and, again according to what LaMoore told Sterling, LaMoore "could see inside the door and she noticed the defendant was kicking or punching the dog and dragging the dog out the door." At this point, the prosecutor asked the open-ended question to which Rodriguez contends his trial lawyer should have objected:

Q. Is there anything else in your investigation with regard to this that I've neglected to ask you that you think it's important for the jury to hear?

A. I think that she just advised she was very, very afraid and very threatened of Mr. Rodriguez. She has advised that she had wanted to—she doesn't

know how to leave Mr. Rodriguez and she even said that the quote she gave me was, the police can't help me. You guys can't help me. You can't protect me or my child.

That ended the State's direct-examination of Officer Sterling.

¶ 7. The cross-examination of Officer Sterling by Rodriguez's trial lawyer was brief, and gave the officer a chance to repeat that Ms. LaMoore was very upset when he spoke to her shortly after he arrived at her house. Additionally, Rodriguez's trial lawyer asked the officer:

Q. And you believe that her statements were truthful at the time?

A. Yes, sir.

Q. Okay. And what are you relying on to believe that they were truthful?

A. I don't believe she had enough time to make up any kind of statement. The way she was, her emotional state. My experience in this area, we've taken a number of domestic violence incidents. When people are this upset and we get there very quickly, there's not enough time in my opinion that I have seen for her to make up any kind of story. That this didn't happen. Also with her injuries that I felt and observed.

¶ 8. The State called West Allis police officer Todd Kurtz as its second witness. Kurtz arrived at LaMoore's house shortly after Sterling, and spoke with LaMoore's little girl, Casey. According to Kurtz, Casey was "crying hysterically" when he first spoke with her "a few seconds" after he arrived. He testified what she told him after he tried "to calm her down for a little bit."

810

> She told me she was trying to sleep in the living room on the couch and that her mom had brought some popcorn into the living room. She told me that Roberto had punched her mom in the head and she didn't know why that had occurred. She then said that Roberto was throwing her mom around the entire house, picking her up and throwing her down, and that at one point she saw Roberto throw her mom into the bathroom.

According to Kurtz, Casey was able to get away and ask "the upstairs neighbor" to call the police, which the neighbor apparently did.

¶ 9. Officer Kurtz also told the jury that the next day he found some of Jill LaMoore's personal property near the LaMoore house, and that he was on his way to return it to her when he saw LaMoore's dog, which he also brought back to the house. Once at the house, the dog started to bark, and Ms. LaMoore came out of the house. Kurtz testified that when he asked about Rodriguez, Ms. LaMoore told him that Rodriguez had returned about an hour after the police had left but that he was then on his way to Texas.

¶ 10. Kurtz testified that he was suspicious about Ms. LaMoore's "body language" and story when Casey came out of the house and told him that Rodriguez had "tried to stab me and my mom with a knife last night." Kurtz then testified:

> I looked at Jill, at the mother, and I said is that true and she put her head down, started to cry, and told me—she told me that that was true. So now I asked her again, I said, are you sure that he's not in the house right now and she was crying and said, you know, no, he's not in there, and as she said that then Casey, the little girl, tucked [sic] on my pants leg and said—she said, mommy, don't lie, he's underneath the couch with a

knife, and I looked at her again and I said is that true. She started crying even harder and said, yes, he's in there.

Officer Kurtz "called for back-up," and, after the other officers arrived, they found Rodriguez underneath a couch with "a knife laying right next to his feet."

¶ 11. As with Sterling, the prosecutor also asked Officer Kurtz whether there was "anything else" the prosecutor "neglected to ask with regards to your investigation that you think is for the jury to hear." Kurtz responded:

> He did make several threats to stab her with the knife and this had gone on for quite a period of time and she said that eventually she just got sick of the—of all these threats and she said she called his bluff and said, well, then go ahead and stab me then if you're going to do it, and he didn't stab her at that point.

### B.

¶ 12. Every defendant in a criminal case is entitled to confront his or her accusers: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. CONST. amend. VI. This clause applies to the states as well as to the federal government. The Wisconsin Constitution also guarantees the right to confrontation: "In all criminal prosecutions the accused shall enjoy the right . . . to meet the witnesses face to face." WIS. CONST. art. 1, § 7. The two clauses are, "generally," coterminous.

*State v. King*, 2005 WI App 224, ¶ 4, 287 Wis. 2d 756, 760, 706 N.W.2d 181, 184 (case citations and quoted case-source omitted). Rodriguez was tried shortly after the United States Supreme Court issued *Crawford v. Washington*, 541 U.S. 36 (2004), which held that a

defendant's right to confrontation is violated if the trial court receives into evidence out-of-court statements by someone who does not testify at the trial if those statements are "testimonial" and the defendant has not had "a prior opportunity" to cross-examine the out-of-court declarant. *Id.*, 541 U.S. at 68. Accordingly, the trial court appropriately held a hearing under WIS. STAT. RULE 901.04(1) to determine whether what Ms. LaMoore and Casey told the officers passed confrontation muster. The State indicated that it was relying on the excited-utterance exception to the rule against hearsay, WIS. STAT. RULE 908.03(2), and was seeking admission of only those things that Ms. LaMoore and Casey told the officers that "relat[ed] to the assault."

■

¶ 13. After hearing from the officers and the lawyers' arguments, the trial court ruled that what LaMoore and her daughter told the officers were "excited utterances" and were not "testimonial" under *Crawford*. Although normally the determination of whether an out-of-court assertion qualifies as an excited utterance is within the trial court's reasoned discretion, *State v. Moats*, 156 Wis. 2d 74, 96, 457 N.W.2d 299, 309 (1990), the constitutional issue of whether admission of an out-of-court assertion violates a defendant's right to confrontation is a matter that we assess *de novo*, *State v. Manuel*, 2005 WI 75, ¶ 25, 281 Wis. 2d 554, 569, 697 N.W.2d 811, 818.

¶ 14. If this case presented purely an evidentiary issue, there would be little doubt, and Rodriguez does not dispute, but that what Ms. LaMoore and her daughter told the officers, as testified to by the officers at the trial, would be admissible as excited utterances under WIS. STAT. RULE 908.03(2), which permits use at trial of an out-of-court assertion irrespective of whether

the declarant testifies at trial if the out-of-court assertion is: "A statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." The rule reflects the law's recognition that persons who are under the stress caused by a startling event are not likely to have had either the time or presence-of-mind to make up a story relating to that event. *See Idaho v. Wright*, 497 U.S. 805, 820 (1990) ("The basis for the 'excited utterance' exception, for example, is that such statements are given under circumstances that eliminate the possibility of fabrication, coaching, or confabulation, and that therefore the circumstances surrounding the making of the statement provide sufficient assurance that the statement is trustworthy and that cross-examination would be superfluous."); *Moats*, 156 Wis. 2d at 97, 457 N.W.2d at 309 ("Statements made by a declarant will be admitted where indications are that he or she is still under shock of injuries or other stress due to special circumstances.").

¶ 15. The confrontation issue in this case turns on whether what the officers testified at the trial Ms. LaMoore and her daughter told the officers were "testimonial" assertions by Ms. LaMoore and her daughter. If they were, Rodriguez's constitutional right of confrontation was violated because he did not have a chance to cross-examine them. *See Crawford*, 541 U.S. at 68. *Crawford* determined that there were two main considerations as to whether an out-of-court assertion is "testimonial," and that the considerations have a gradient overlap: "An accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not." *Id.*, 541 U.S. at 51. The former is within what *Crawford* calls the "core class of 'testi-

814

monial' statements"; the latter is not. *Ibid.* Beyond that, "what is 'testimonial' hearsay" was, at least until *Davis v. Washington*, 126 S. Ct. 2266 (2006), "still in flux." *King*, 2005 WI App 224, ¶ 5, 287 Wis. 2d at 761, 706 N.W.2d at 184. Thus, *Crawford* noted that it was leaving "for another day any effort to spell out a comprehensive definition of 'testimonial.' " *Id.*, 541 U.S. at 68. That day came, at least for further clarification of what is and what is not "testimonial" for confrontation purposes, when the United States Supreme Court issued *Davis*.

¶ 16. *Davis* was a consolidated decision in two cases: *Davis v. Washington* and *Hammon v. Indiana*. *Davis*, 126 S. Ct. at 2270, 2272. *Davis* proper concerned a victim's out-of-court declarations to a 911 operator. *Id.*, 126 S. Ct. at 2270–2271. The victim told the operator that her former boyfriend, whom she identified in the call, was " 'here jumpin' on me again.' " *Id.*, 126 S. Ct. at 2271. "As the conversation continued, the operator learned that Davis had 'just r[un] out the door' after hitting [the victim], and that he was leaving in a car with someone else." *Ibid.* (first set of brackets by *Davis*). The victim's statements to the operator were both volunteered and in response to the operator's questions. *Ibid.*

¶ 17. In *Hammon*, police went to a house on a domestic-disturbance call, where they found Hershel Hammon's wife "alone on the front porch, appearing somewhat frightened, but she told them that nothing was the matter." *Davis*, 126 S. Ct. at 2272 (internal quotation marks omitted). The officers took Hammon's wife back into the house, where they saw Hammon and signs of a fight. Hammon attempted to assure the officers that although "he and his wife had been in an argument," everything was all right. *Ibid.* (internal quotation marks omitted). The officers then took

815

Hammon's wife aside and, without Hammon being permitted to be present, asked her to tell them what had happened. *Ibid.* "After hearing [Hammon's wife's] account, the officer 'had her fill out and sign a battery affidavit,' " in which she wrote: " 'Broke our Furnace & shoved me down on the floor into the broken glass. Hit me in the chest and threw me down. Broke our lamps & phone. Tore up my van where I couldn't leave the house. Attacked my daughter.' " *Ibid.*

¶ 18. *Davis* reiterated that the Confrontation Clause "bars 'admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination,' " and that the critical focus is on whether the out-of-court declarations are " 'testimonial statements' " because "[o]nly statements of this sort cause the declarant to be a 'witness' within the meaning of the Confrontation Clause." *Id.*, 126 S. Ct. at 2273 (quoting *Crawford*, 541 U.S. at 51). Resolving much of the ambiguity left by *Crawford*, *Davis* set out the following bright-line, but, perhaps, not conclusive rule:

> Without attempting to produce an exhaustive classification of all conceivable statements-or even all conceivable statements in response to police interrogation-as either testimonial or nontestimonial, it suffices to decide the present case to hold as follows: Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.

*Davis*, 126 S. Ct. at 2273–2274. Applying that rule to the two cases before it, *Davis* held that at least the early out-of-court declarations made by the victim in *Davis* to the 911 operator, even if in response to interrogation, permitted law-enforcement to assess the nature of the reported problem or emergency, including the "identity of the assailant, so that the dispatched officers might know whether they would be encountering a violent felon," and were thus non-testimonial because the facts "objectively indicate [their] primary purpose was to enable police assistance to meet an ongoing emergency. [The victim in *Davis*] simply was not acting as a *witness;* she was not *testifying*. What she said was not a 'weaker substitute for live testimony' at trial." *Id.*, 126 S. Ct. at 2276–2277 (quoted source omitted, emphasis by *Davis*).[1]

¶ 19. In *Hammon*, however, the situation was different. There, the out-of-court declarations, both oral and in the affidavit, given to the police officers were after the emergency had passed and were a recording of past events rather than information pertinent to an assessment of a potential ongoing emergency. *Davis*, 126 S. Ct. at 2278 (the officer in *Hammon* was "not seeking to determine (as in *Davis*) 'what is happening,' but rather 'what happened.' ") (parenthetical by *Davis*). We now turn to our case, and analyze it under both Wisconsin case law and the United States Supreme Court's latest word in *Davis*.

---

[1] *Davis v. Washington*, 126 S. Ct. 2266 (2006), did not parse some of the later out-of-court declarations by the victim in that case to the 911 operator because no one challenged the Washington Supreme Court's determination that even if the later statements were testimonial, their admission into evidence at Davis's trial was harmless beyond a reasonable doubt. *Id.*, 126 S. Ct. at 2271–2272.

¶ 20. In analyzing whether an out-of-court declaration is "testimonial" under *Crawford* "Wisconsin has, 'at a minimum,' adopted what *Manuel* calls '*Crawford*'s formulations.' " *King*, 2005 WI App 224, ¶ 5, 287 Wis. 2d at 761, 706 N.W.2d at 184 (referencing *Manuel*, 2005 WI 75, ¶ 39, 281 Wis. 2d at 577, 697 N.W.2d at 822). *Manuel* set out the formulations as follows:

> (1) "[*E*]*x parte* in-court testimony or its functional equivalent—that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially."

> (2) "[E]xtrajudicial statements . . . contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions."

> (3) "[S]tatements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial."

*Id.*, 2005 WI 75, ¶ 37, 281 Wis. 2d at 575–576, 697 N.W.2d at 821 (citations to *Crawford* omitted; brackets by *Manuel*).[2]

---

[2] We noted in *State v. King*, 2005 WI App 224, ¶ 5 n.1, 287 Wis. 2d 756, 761 n.1, 706 N.W.2d 181, 184 n.1, that the "formulations" were not crafted by *Crawford v. Washington*, 541 U.S. 36, 51 (2004), but were, rather, proposals submitted by the defendant in *Crawford* and two *amici* briefs. Nevertheless, as we did in *King*, "we assume that [*State v.*] *Manuel*[, 2005 WI 75, ¶ 39, 281 Wis. 2d 554, 577, 697 N.W.2d 811, 822,] intended to adopt the party- and *amici*-phrased formulations, and we apply them here" as well. *See King*, 2005 WI App 224, ¶ 5 n.1, 287 Wis. 2d at 761 n.1, 706 N.W.2d at 184 n.1. *Davis* emphasized that those "formulations" were not those of *Crawford*: "Our

> For a statement to be testimonial under the first formulation, it must be "ex parte in-court testimony or its functional equivalent." For a statement to be testimonial under the second formulation, it must be an "extrajudicial statement[] . . . contained in formalized testimonial materials, such as [an] affidavit[], deposition[], prior testimony, or confession[]. For a statement to be testimonial under the third formulation, it must be a "statement[] that [was] made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial."

*Id.*, 2005 WI 75, ¶¶ 40–42, 281 Wis. 2d at 577–578, 697 N.W.2d at 822 (citations to *Crawford* and paragraphing omitted; brackets by *Manuel*). Rodriguez does not contend that what Ms. LaMoore and her daughter told the officers falls within the first two *Manuel*-adopted formulations but argues that it is within the third, to which we now turn.

¶ 21. In adopting the three formulations, *Manuel* applied *Crawford*, and not the Wisconsin Constitution's confrontation clause. *Manuel*, 2005 WI 75, ¶¶ 36–53, 281 Wis. 2d at 574–582, 697 N.W.2d at 820–824. *Crawford*, however, concerned an out-of-court declaration that was a "testimonial" paradigm—custodial interrogation by law-enforcement officers of the defendant's wife who did not testify because of the State of Washington's marital-privilege. *Crawford*, 541 U.S. at 38–40. *Manuel*, on the other hand, dealt with what a witness to Manuel's crime told the witness's girlfriend, who later

opinion in *Crawford* set forth '[v]arious formulations' of the core class of " 'testimonial statements,' " *ibid.*, but found it unnecessary to endorse any of them, because 'some statements qualify under any definition,' *id.*, [541 U.S.] at 52." *Davis*, 126 S. Ct. at 2273.

told the police. *Manuel*, 2005 WI 75, ¶¶ 1, 9–10, 281 Wis. 2d at 561, 564–565, 697 N.W.2d at 814, 816. The witness did not testify at Manuel's trial because he successfully asserted his Fifth Amendment privilege against self-incrimination. *Id.*, 2005 WI 75, ¶¶ 1, 13, 281 Wis. 2d at 561, 565, 697 N.W.2d at 814, 816. The witness's girlfriend testified at the trial but claimed that she could not recall precisely what the witness told her about the shooting. *Id.*, 2005 WI 75, ¶¶ 1, 13, 281 Wis. 2d at 561–562, 565–566, 697 N.W.2d at 814, 816. A police officer testified at trial about what the witness's girlfriend told the officer about the shooting. *Id.*, 2005 WI 75, ¶¶ 1, 13, 281 Wis. 2d at 562, 566, 697 N.W.2d at 814, 816. *Manuel* held that the witness's out-of-court declarations to his girlfriend were not "testimonial" under any of the three *Crawford* formulations that it adopted. *Manuel*, 2005 WI 75, ¶¶ 40–53, 281 Wis. 2d at 577–582, 697 N.W.2d at 822–824. *Manuel* concluded that there was nothing in the *Manuel* record showing that either the witness expected his girlfriend to tell the police what he told her, or that he was "attempting to use [the girlfriend] to mislead the police on his own behalf." *Id.*, 2005 WI 75, ¶ 53, 281 Wis. 2d at 581–582, 697 N.W.2d at 824.

¶ 22. The third "*Crawford* formulation" comes from an *amicus curiae* brief submitted to the United States Supreme Court in *Crawford* by its lead author, the National Association of Criminal Defense Lawyers. *King*, 2005 WI App 224, ¶ 5 n.1, 287 Wis. 2d at 761 n.1, 706 N.W.2d at 184 n.1. Even that brief, however, was not seeking a *per se* rule that made "testimonial" everything that an out-of-court declarant told law-enforcement:

> *By and large,* statements made to law enforcement officials about a crime will be testimonial. And by and large, statements made to friends, relatives, accomplices or anyone outside of criminal justice system will not be testimonial.

There will be exceptions to these broad and general rules, of course. A witness to a crime may make a statement to a friend knowing that the friend will subsequently contact police. Such a statement is aimed at law enforcement and would therefore be testimonial. And calls to 911 call for some judgment in the application of the testimonial approach. That is because 911 serves a dual role in our society. It is both a component of our law enforcement system (suggesting that statements to 911 are testimonial) and an emergency response system (suggesting that statements to 911 are not testimonial). Whether a particular statement made to a 911 dispatcher was testimonial would depend on which capacity the caller was using when contacting the system.

Brief for the National Association of Criminal Defense Lawyers *et al.* as *Amici Curiae* Supporting Petitioner at 25, *Crawford v. Washington*, 541 U.S. 36 (2004) (No. 02–9410), 2003 WL 21754961 (emphasis added; citation omitted).

¶ 23. We have a similar situation here. Victims' excited utterances to law-enforcement officers responding to either an on-going or recently completed crime, serve, as with the 911–call, a dual role—the dichotomy between finding out what *is* happening as opposed to recording what *had* happened, which, as we have seen, was recognized in *Davis. See, e.g., Davis*, 126 S. Ct. at 2278; *see also State v. Parks*, 116 P.3d 631, 639 (Ariz. Ct. App. 2005) ("Whether an excited utterance will be testimonial, thus, depends on the circumstances existing when the statement was made."). Insofar as a victim's excited utterances to a responding law-enforcement officer encompass injuries for which treatment may be necessary, or reveal who inflicted those injuries, which may facilitate apprehension of the offender, they serve societal goals other than adducing

evidence for later use at trial. *Davis*, 126 S. Ct. at 2277. Several of our recent, albeit pre-*Davis*, decisions are consistent with this common-sense recognition.

¶ 24. In *State v. Hemphill*, 2005 WI App 248, 287 Wis. 2d 600, 707 N.W.2d 313, police responded to a " 'trouble with subjects' " and " 'subject with gun' " call. *Id.*, 2005 WI App 248, ¶ 2, 287 Wis. 2d at 602, 707 N.W.2d at 314. When they arrived, a woman standing outside of the building "pointed at two people who were walking away from the building and said something like, 'Those are the ones. That's them.' " *Ibid.* The police ultimately arrested Hemphill, who was one of the men to whom the woman pointed. *Id.*, 2005 WI App 248, ¶ 3, 287 Wis. 2d at 602–603, 707 N.W.2d at 314. The woman did not testify at the trial, and responding police officers told the jury what she had said. *Id.*, 2005 WI App 248, ¶ 4, 287 Wis. 2d at 603, 707 N.W.2d at 314–315. Hemphill contended that this violated *Crawford* because, in his view, her out-of-court declarations were "testimonial." We disagreed, pointing out that what she said "was not a statement extracted by the police with the intent that it would be used later at trial," but, rather, "was a spontaneous statement." *Hemphill*, 2005 WI App 248, ¶ 11, 287 Wis. 2d at 605, 707 N.W.2d at 316. Of course, the arrival of the police to the scene of a disturbance carries with it the tacit question of "where are they?" even if not spoken, and the woman's response to the officers' arrival was not, therefore, equivalent to a wholly spontaneous exclamation made by someone not aware that his or her words would result in law-enforcement action.

¶ 25. In *State v. Searcy*, 2006 WI App 8, 288 Wis. 2d 804, 709 N.W.2d 497 (Ct. App. 2005), Searcy's cousin told police officers who were arresting Searcy for burglary that she was Searcy's cousin and that he was

staying with her, thus tying "him to the residence where the police found stolen items." *Id.*, 2006 WI App 8, ¶¶ 1, 11, 288 Wis. 2d at 813, 816–817, 709 N.W.2d at 500, 502. Her statements to the officers were wholly unsolicited, as one of them testified: "a large crowd gathered and 'one lady in the crowd came up and said that she was Mr. Searcy's cousin, and that he was staying with her in the neighborhood there.' " *Id.*, 2006 WI App 8, ¶ 11, 288 Wis. 2d at 816–817, 709 N.W.2d at 502. In rejecting Searcy's *Crawford*-based confrontation challenge, we explained that what she told the police did not fall within any of the three *Crawford/Manuel* formulations: the woman "initiated the interaction with the officers; the police did not seek her out." *Id.*, 2006 WI App 8, ¶ 53, 288 Wis. 2d at 837, 709 N.W.2d at 512. Further, the cousin's comments to the police were not "made in response to a tactically structured police interrogation, or in response to any questioning at all." *Ibid.*

¶ 26. A similar analysis applies when police talk to an attack-victim when the stress and cognitive disruption caused by the attack is still dominant, because the key consideration in connection with both the third *Crawford/Manuel* formulation and *Davis*'s rubric, focuses on an objective analysis of the out-of-court declarant's expectation as to how what he or she tells law enforcement will be used. *See Davis*, 126 S. Ct. at 2272–2273; *Manuel*, 2005 WI 75, ¶ 37, 281 Wis. 2d at 576, 697 N.W.2d at 821 (third formulation concerns " 'statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial' ") (citation to *Crawford* omitted). Thus, the out-of-court declaration must be evaluated to determine whether it is, on one hand, overtly or covertly intended by the speaker to implicate an accused at a

later judicial proceeding, or, on the other hand, is a burst of stress-generated words whose main function is to get help and succor, or to secure safety, and are thus devoid of the "possibility of fabrication, coaching, or confabulation." *See Wright*, 497 U.S. at 820. We examine against this background what Ms. LaMoore and her daughter Casey told the officers, both at the initial response to the neighbor's 911–call, and the following day.

¶ 27. There is nothing in the Record here that indicates that what Rodriguez does not dispute were "excited utterances" by Ms. LaMoore and Casey when the officers first spoke with them were motivated by anything other than their desire to get help and secure safety. Moreover, given their contemporaneously endured trauma it cannot be said that objectively they said what they said to the officers with a conscious expectation that their words would somehow have the potential for use in court against Rodriguez. It also cannot be said that, objectively, the officers intended to record past activities rather than assess the then-current situation. Moreover, there is nothing in the Record that indicates that anything either Ms. LaMoore or her daughter told the officers during that first encounter was in response to any sort of structured interrogation to questioning beyond simple inquiries. Simply put, Officers Sterling and Kurtz did not go to the LaMoore house looking for evidence with which to prosecute Rodriguez, and, after they arrived their focus was not on building a case against him but, rather, trying to ensure the safety of Ms. LaMoore and her daughter, and other members of the community. Thus, those out-of-court declarations were not testimonial. Similarly, when Officer Kurtz went to the LaMoore house the next morning to return the dog and other property, his inquiries were limited to an

assessment of whether Ms. LaMoore and Casey were still in danger, and Casey's tug on the officer's trouser leg and spontaneous exclamation begging her mother not to lie and revealing that Rodriguez was still there and still a severe threat to their safety was also, under our *de novo* analysis, not "testimonial." Once prodded by her daughter, Ms. LaMoore broke down and admitted the truth in an otherwise unprompted collapse of her fragile pretense that all was well. Those statements, also, were not "testimonial."

¶ 28. A determination that an out-of-court declaration is not testimonial, does not end our inquiry. Rather, the analysis then turns to whether under pre-*Crawford* analysis, the dual test in *Ohio v. Roberts*, 448 U.S. 56 (1980), of unavailability and whether there are sufficient " 'indicia of reliability' " attached to the declarations is satisfied so as to make their receipt into evidence permissible under the confrontation clause. *Manuel*, 2005 WI 75, ¶¶ 60–61, 281 Wis. 2d at 586–587, 697 N.W.2d at 826–827; *Crawford*, 541 U.S. at 68 (states may use the *Roberts* approach for non-testimonial hearsay). Here, Rodriguez does not argue that Ms. LaMoore and Casey were not "unavailable" or that because "excited utterances" are "firmly rooted" exceptions to the hearsay rule, *State v. Ballos*, 230 Wis. 2d 495, 510, 602 N.W.2d 117, 124 (Ct. App. 1999), the *Roberts* test is not satisfied. Accordingly, Rodriguez was not denied his right to confrontation by the officers' testimony relating what Ms. LaMoore and her daughter told them.

**II.** STREET GANG QUESTIONS.

A.

¶ 29. Rodriguez's brother, Luis Rodriguez, testified that he had spoken with Ms. LaMoore and that she told him that what she and Casey had related to

Officers Sterling and Kurtz was not true, and that she was not going to go to court even though she was subpoenaed because, according to Rodriguez's brother, "nothing happened" that night other than a fight because, according to the brother, LaMoore was angry at Rodriguez for not getting her drugs. On cross-examination, the State asked the brother whether LaMoore was afraid of him and, for that reason, falsely recanted. When the brother replied that LaMoore was not afraid of him, the prosecutor asked:

Q She's not afraid of anybody that you're affiliated with?

A Correct. I'm not affiliated with nothing.

Q What's a Spanish Cobra?

A It's a —

At that point, Rodriguez's lawyer objected and the trial court excused the jury to discuss the matter with the lawyers.

¶ 30. The prosecutor indicated that he wanted to ask about the brother's alleged street-gang affiliation because Ms. LaMoore had also told the West Allis police that she was afraid of Rodriguez and his family, and read to the trial court excerpts from a police report:

"Jill stated that she has tried to break up with Roberto in the past. During this time Roberto, his friends and family threatened her and damaged her property. She reported that one year ago the furniture and house was set on fire. She did not have proof, but knows it was Roberto's family. Jill stated that Roberto is a member of the Spanish Cobra gang and is afraid to leave him due to possible retaliation."

The State argued that the street-gang question went to Ms. LaMoore's state of mind in allegedly recanting what

she and Casey told the officers. The trial court overruled Rodriguez's objection. When asked in front of the jury about the Spanish Cobras, Rodriguez's brother, after first denying that he had been affiliated with the gang, admitted that he "used to hang out with them" from about 1979 until 1990.

## B.

¶ 31. A trial court's decision to receive evidence is vested within its discretion, and we will not reverse if that decision is one that a reasonable judge could make. *Wittig v. Hoffart*, 2005 WI App 198, ¶ 12, 287 Wis. 2d 353, 363–364, 704 N.W.2d 415, 419. As we have seen, Ms. LaMoore was a hearsay declarant against Rodriguez, and, accordingly, the rules permitted Rodriguez to attack her credibility. *See* Wis. Stat. Rule 908.06 ("When a hearsay statement has been admitted in evidence, the credibility of the declarant may be attacked, and if attacked may be supported by any evidence which would be admissible for those purposes if declarant had testified as a witness."). Rodriguez attacked Ms. LaMoore's credibility by claiming that she had admitted to the brother having made up what she told the officers. Rodriguez thus put into issue whether LaMoore had a motive to "recant" to Rodriguez's brother, and the State had a concomitant right to try to show that her alleged recantation was false. *See id.* ("When a hearsay statement has been admitted in evidence, the credibility of the declarant may be attacked, *and if attacked may be supported by any evidence which would be admissible for those purposes if declarant had testified as a witness*.") (emphasis added). A witness's motive (whether testifying "live" or by admission of his or her out-of-court assertions) is never

collateral, *see State v. Williamson*, 84 Wis. 2d 370, 383, 267 N.W.2d 337, 343 (1978), and, if an out-of-court declarant, may be attacked and supported as provided for in RULE 908.06. Moreover, given the crucial nature of evidence provided by LaMoore's out-of-court assertions, we cannot say that the "probative value" of a possible motive for her to falsely recant was "substantially outweighed by the danger of unfair prejudice" to Rodriguez. *See* WIS. STAT. RULE 904.03 ("Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice."). The trial court did not erroneously exercise its discretion in overruling Rodriguez's objection to the State's gang-related questions to his brother.

### III. PROSECUTOR'S CROSS-EXAMINATION OF RODRIGUEZ.

¶ 32. Rodriguez contends that he was denied a fair trial when the State asked on cross-examination about his pending misdemeanor and felony cases. We disagree.

¶ 33. Rodriguez testified that he did not hit LaMoore that night, and told the jury that he left because she kept demanding that he get her some drugs, and began pummeling him when he was watching "some beautiful gorgeous girls on TV" because she was, according to Rodriguez, "very jealous." Finally, after further conflicts between them that evening, Rodriguez testified that he told LaMoore that he "had enough of her behavior," that he was going to pack his things and go to Texas. He said that he left the house, but was going to return when he remembered that he had left his car and house keys "at the house." He told the jury, however, that when he saw the officers at the house he "left the scene" because he had "a warrant in Waukesha for a driving ticket." When his lawyer asked, "So basically you were concerned about an outstanding

warrant and that's why you didn't go back right away?" Rodriguez replied, "Yes. Yes."

¶ 34. On cross-examination the prosecutor asked the questions about which Rodriguez complains:

Q. Everything is the truth, sir?

A. Yes.

Q. One traffic ticket warrant?

A. One traffic ticket warrant?

Q. Just one ticket warrant?

A. What do you mean, one warrant?

Q. About four, five warrants out for your arrest that you knew about because you were failing to appear in court in Waukesha and Milwaukee County, right?

A. For what? Okay. With the knowledge at the time I knew I had one warrant. Okay. That's all I knew at the time.

Q. And that's despite being in court on criminal cases, being told that there would be a warrant issued for your arrest if you failed to appear?

A. Yes.

Q. And you knew those were ongoing and you had failed to appear?

A. Yes.

Q. So do you want to change that lie a little bit that there was more than one warrant that you were aware of?

A. At the time I was only aware of one—about one case.

Q. Now, you said you were aware of one ticket?

A. One ticket, one case.

Q. You weren't aware of a felony criminal case, a misdemeanor criminal case, theft, theft, retail theft, issue of worthless checks?

[Rodriguez's lawyer]: Objection.

[Prosecutor]: It's the defendant's statement. It's clear on cross. This is a lie.

THE COURT: Overruled.

Rodriguez argues that this was improper impeachment under Wis. Stat. Rule 906.08(2) and also complains that the prosecutor improperly used the words "lie" and "lying."

¶ 35. Wisconsin Stat. Rule 906.08(2) provides:

Specific instances of the conduct of a witness, for the purpose of attacking or supporting the witness's credibility, other than a conviction of a crime or an adjudication of delinquency as provided in s. 906.09, may not be proved by extrinsic evidence. *They may, however, subject to s. 972.11 (2), if probative of truthfulness or untruthfulness and not remote in time, be inquired into on cross-examination of the witness* or on cross-examination of a witness who testifies to his or her character for truthfulness or untruthfulness.

(Emphasis added.) Rodriguez argues that impeachment is permitted by convictions only, *see* Wis. Stat. Rule 906.09, and that the prosecutor's questions brought before the jury "other wrongs evidence prohibited by

Wis. Stat. § 904.04(2)." Rodriguez does not brief the Rule 904.04(2) contention, and, accordingly, we do not address it. *See Vesely v. Security First Nat'l Bank of Sheboygan Trust Dep't*, 128 Wis. 2d 246, 255 n.5, 381 N.W.2d 593, 598 n.5 (Ct. App. 1985). As we have seen, however, Rule 906.08(2) permits the cross-examination of a witness about "extrinsic" matters, "if probative of truthfulness or untruthfulness." Certainly, lying on direct-examination, and repeating the lie on cross-examination, is "probative of truthfulness." Moreover, Rodriguez opened the door, and the prosecutor was fully justified in calling him on it. *See Harris v. New York*, 401 U.S. 222, 223–226 (1971) (prosecutor did not violate defendant's rights by introducing on cross-examination the defendant's statement to the police even though the defendant had not been warned of his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966), because the defendant opened the door by denying matters he admitted in that uncounseled statement) ("Every criminal defendant is privileged to testify in his own defense, or to refuse to do so. But that privilege cannot be construed to include the right to commit perjury. Having voluntarily taken the stand, petitioner was under an obligation to speak truthfully and accurately, and the prosecution here did no more than utilize the traditional truth-testing devices of the adversary process.") (citations omitted). Further, in context, the prosecutor's use of the words "lie" and "lying" was not, as Rodriguez contends, the prosecutor's "personal[] comment" on Rodriguez's credibility; it was the prosecutor's confronting Rodriguez with what Rodriguez tacitly at least admitted were inconsistencies in his testimony, when he acknowledged that he did, indeed, have unexecuted warrants. Rodriguez's claim that what the prosecutor did denied him a fair trial is without merit.

831

**IV. TRIAL COURT'S REFUSAL TO RECUSE ITSELF.**

¶ 36. When Rodriguez at sentencing mentioned that he did not believe that his trial lawyer had given him good representation, the trial court responded:

> That's—I guess you can—you have the right to file an appeal on that basis, I guess, but if I had to answer that question if there was a hearing before this court since I heard the trial I know what [Rodriguez's trial lawyer] did for you, I would have to say that you're wrong. Court of Appeals could decide that but it would be my—at least my hearing I would find that that [Rodriguez's trial lawyer] was not incompetent in any way. I find that he was very competent in the way he handled your case.

Rodriguez contends that what the trial court said reflects at least the appearance of bias, and that it should have recused itself from hearing Rodriguez's postconviction motion alleging ineffective assistance of counsel. Although the parties debate whether Wisconsin's dual test of judicial impartiality, with its objective and subjective elements, *see State v. Rochelt*, 165 Wis. 2d 373, 378–379, 477 N.W.2d 659, 661 (Ct. App. 1991), is still good law, the short of it is that, absent a pervasive and perverse animus, which Rodriguez does not allege, a judge may assess a case and potential arguments based on what he or she knows from the case in the course of the judge's judicial responsibilities. *See Liteky v. United States*, 510 U.S. 540, 555 (1994) ("[O]pinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism

that would make fair judgment impossible."). The trial court did not err in declining to recuse itself from consideration of Rodriguez's postconviction motion.

## V. EFFECTIVE ASSISTANCE OF COUNSEL.

¶ 37. As we have seen, Rodriguez contends that his lawyer gave him constitutionally deficient representation in two respects: (1) by not objecting to the prosecutor's open-ended questions to both officers at the end of their direct-examinations, and (2) by asking Officer Sterling why he believed what Ms. LaMoore told him that night. We examine these contentions in turn.

¶ 38. What is or is not ineffective assistance of counsel is governed by the watershed decision *Strickland v. Washington*, 466 U.S. 668 (1984).

> To establish ineffective assistance of counsel, a defendant must show: (1) deficient performance, and (2) prejudice. To prove deficient performance, a defendant must point to specific acts or omissions by the lawyer that are "outside the wide range of professionally competent assistance." To prove prejudice, a defendant must demonstrate that the lawyer's errors were so serious that the defendant was deprived of a fair trial and a reliable outcome. Thus, in order to succeed on the prejudice aspect of the *Strickland* analysis, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome."

*State v. Ellington*, 2005 WI App 243, ¶ 15, 288 Wis. 2d 264, 278–279, 707 N.W.2d 907, 914 (citations and quoted source omitted). In denying Rodriguez's postconviction motion, the trial court determined that it did

not have to assess whether Rodriguez's trial lawyer's representation was deficient because Rodriguez did not show how he was prejudiced by what the lawyer did or did not do. We agree.

## A. *Open-Ended Questions.*

¶ 39. Questions that call for a narrative are generally improper because they do not alert court and counsel to the subject about which the witness is about to testify. There are exceptions, however, and whether to permit a question calling for a narrative response is within the trial court's discretion under WIS. STAT. RULE 906.11, Wisconsin's version of RULE 611 of the Federal Rules of Evidence. *See United States v. Garcia,* 625 F.2d 162, 169 (7th Cir. 1980) ("There is, of course, nothing particularly unusual, or incorrect, in a procedure of letting a witness relate pertinent information in a narrative form as long as it stays within the bounds of pertinency and materiality."). Absent a blurt-out in response to an open-ended question that significantly prejudices the adversary, it is rare for an open-ended question to require reversal. *See State v. Jeannie M.P.,* 2005 WI App 183, ¶ 8, 286 Wis. 2d 721, 731, 703 N.W.2d 694, 699 (trial lawyer did not provide constitutionally deficient performance when he explained at a postconviction evidentiary hearing that he had a strategic reason for asking an open-ended question). Rodriguez has not shown prejudice here; much of what the officers "added" was cumulative, and, further, if Rodriguez's trial lawyer had objected, the prosecutor could have simply reviewed his notes and asked more focused questions to each officer.

## B. *Questions by Rodriguez's Trial Lawyer to Officer Sterling.*

¶ 40. The trial court did not hold an evidentiary hearing under *State v. Machner*, 92 Wis. 2d 797, 285 N.W.2d 905 (Ct. App. 1979), to determine whether Rodriguez's trial lawyer had a strategic reason to ask Officer Sterling whether he believed Ms. LaMoore when the officer spoke with her shortly after he arrived at LaMoore's house. Thus, although the State posits a strategic reason in its appellate brief, we have no way of assessing it without the trial lawyer's testimony. *See id.*, 92 Wis. 2d at 804, 285 N.W.2d at 908–909. A *Machner* hearing here, however, was not required, because we agree with the trial court, on our *de novo* review, that Rodriguez has not shown the requisite prejudice.

¶ 41. Officer Sterling's response to the question about which Rodriguez complains both: (1) repeated testimony that was already before the jury (her emotional situation and the time that elapsed from when the police department received the 911–call to Sterling's talk with LaMoore), and (2) the rest of Sterling's response, if not already before the jury, was either something the jurors could reasonably infer from the evidence (that LaMoore was afraid of Rodriguez) or was within their common experience (that persons under great stress caused by something generally do not have the cognitive ability to fabricate). Indeed, as we have already seen, this is the underpinning to the "excited utterance" exception to the rule against hearsay, and is why it is "firmly rooted" in our jurisprudence. Accordingly, Rodriguez has not carried his burden to show that he was prejudiced by his trial lawyer's questions to Officer Sterling.

835

■■■■■■■■■■

*By the Court.*—Judgments and order affirmed.

¶ 42. CURLEY, J. (*dissenting*). In the landmark case of *Crawford v. Washington*, 541 U.S. 36 (2004), the United States Supreme Court announced that out-of-court statements by witnesses that are testimonial are barred under the Confrontation Clause unless the witnesses are unavailable and the defendants had a prior opportunity to cross-examine them, regardless of whether such statements are deemed reliable by the court. In *Crawford*, the Court advised that statements that are testimonial include "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." *Id.* at 52 (citation omitted).

¶ 43. Recently, the Supreme Court again weighed in on the issue in *Davis v. Washington*, (No. 05–5224), and *Hammon v. Indiana*, (No. 05–5705), 547 U.S. ___, 126 S.Ct. 2266 (2006). In these latest two cases, the Supreme Court refined the definition of what is a "testimonial" statement, and determined in *Davis* that 911 calls in which a party seeks assistance while the emergency still exists are "nontestimonial." *Id.* at 2276–77. However, in *Hammon*, the Court determined that when a police officer, responding to a domestic violence call, encounters two people who are no longer engaged in any disputes, but sees evidence that a fight occurred, and elicits a statement from one that the other person in the home hit her, that statement is testimonial. *Id.* at 2278–79. It appears that the lynchpin for the different outcomes was the fact that in *Davis*, the emergency was ongoing, while in *Hammon*, the emergency had ended. The Supreme Court noted that:

> The statements in *Davis* were taken when McCottry was alone, not only unprotected by police (as Amy Hammon was protected), but apparently in immediate danger from Davis. She was seeking aid, not telling a story about the past. McCottry's present-tense statements showed immediacy; Amy's narrative of past events was delivered at some remove in time from the danger she described.

*Id.* at 2279. Applying these holdings to our facts, I disagree with the majority's conclusion that the victims' two sets of excited utterances occurring on separate days were entirely non-testimonial in nature, and thus admissible at trial when the victims failed to appear.

¶ 44. The initial contact the police had with LaMoore and her daughter fell outside the "911" call exception of *Davis* because the emergency had ended by the time the police arrived. Rodriguez was not in the home. Thus, the questioning and investigation was testimonial as the victims certainly expected that their later statements would form the basis of a criminal complaint against Rodriquez and "be available for use at a later trial." LaMoore and her daughter's second encounter with police came the next day when the police returned LaMoore's property and dog to her. One of the motives behind the police going to LaMoore's residence and returning LaMoore's property was to locate Rodriquez. The subsequent police interrogation of LaMoore revealed that Rodriquez was hiding in the house. No "emergency response system" prompted the police to return to the home, and LaMoore knew by answering the police questions and acknowledging that Rodriquez was in the home that her statement would be used by police at trial. LaMoore may have been fearful when she found herself confronted by the police while Rodriguez hid in the house, but the police questioning

837

and her responses did not fall within the "emergency response system" exception. She was outside the home when interrogated, protected by the police, while Rodriguez was inside.

¶ 45. The majority bootstraps its decision legitimizing the admission of these statements by noting that excited utterances often have a higher degree of reliability than other statements. However, the Supreme Court's ruling reinvigorated the constitutional right that under our system of justice the accused has the right to *confront* the accusers. The holding in *Crawford* specifically abrogated the prior law found in *Ohio v. Roberts*, 448 U.S. 56 (1980), and said that no matter how reliable a testimonial statement may appear, reliability must be tested by cross-examination. *Crawford*, 541 U.S. at 61.

¶ 46. I also see a distinction between the Wisconsin cases the majority cited for support and the facts here. In both *State v. Hemphill*, 2005 WI App 248, 287 Wis. 2d 600, 707 N.W.2d 313, and *State v. Searcy*, 2006 WI App 8, 288 Wis. 2d 804, 709 N.W.2d 497, citizen witnessesnot victimsvolunteered an isolated bit of information to the police. Citizens who volunteer information of this nature to the police usually do not have an expectation that their statements will require them to testify. This is in contrast to victims who ordinarily would assume that information they give to the police regarding a crime would "be available for use at a later trial."

¶ 47. The end result of the majority's determination is that Rodriquez had no opportunity to confront his accusers and the jury was denied the opportunity to evaluate the accusers' testimony and assess their demeanor, both often key in a search for the truth and in

rendering a thoughtful decision. Indeed, the State's case concerning the first four counts consisted solely of police officers' testimony.

¶ 48. Finally, other events in this trial raise doubts about its fairness. The exploration of a defense witness's gang affiliation ten years before is questionable. So, too, Rodriguez's defense counsel's failure to object to obviously improper questions by the prosecutor and his cross-examination of a police officer which led to the police vouching for the truthfulness of the victimsa question that the prosecutor would have been prohibited from askingstrongly suggest that defense counsel's trial skills were woefully inadequate and that Rodriguez was prejudiced as a result.

¶ 49. For the aforementioned reasons, I respectfully dissent.